**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 15 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

DANIEL T. TOWNSEND,

      Plaintiff - Appellee and Cross-
Appellant,

vs.

DANIEL, MANN, JOHNSON &
MENDENHALL, a California
corporation,

      Defendant - Appellant and
Cross-Appellee.

Nos. 98-1313, 98-1337

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 97-Z-604)

---

Blain D. Myhre (Juli E. Lapin, Theresa L. Corrada, with him on the briefs),
Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, Colorado, for Plaintiff-
Appellee and Cross-Appellant.

Andrew M. Low (Janet A. Savage, Kenzo S. Kawanabe, with him on the briefs),
Davis, Graham & Stubbs, L.L.P., Denver, Colorado, for Defendant-Appellant and
Cross-Appellee.

---

Before **SEYMOUR**, Chief Judge, **PORFILIO**, and **KELLY**, Circuit Judges.

**KELLY**, Circuit Judge.

Defendant-Appellant and Cross-Appellee, Daniel, Mann, Johnson & Mendenhall ("DMJM"), appeals from a judgment on a jury verdict in favor of Plaintiff-Appellee and Cross-Appellant, Daniel Townsend ("Townsend"), on a breach of contract claim. DMJM argues that the district court erred in denying: (1) DMJM's motion for judgment as a matter of law based upon insufficient evidence of contract formation between DMJM and Townsend; and (2) DMJM's motion for remittitur. Townsend cross-appeals, contending that the trial court erred when it (1) denied front pay damages and refused to allow the jury to consider evidence of such damages; (2) refused to instruct the jury that it could award emotional distress damages for the breach of contract; (3) denied Townsend's motion to amend his complaint to add a claim of misrepresentation; and (4) awarded sanctions against Townsend for failing to supplement his responses to discovery questions when further information became available. Our jurisdiction in this diversity action arises under 28 U.S.C. § 1291 and we affirm on all issues except the imposition of sanctions.

## Background

Daniel Townsend began working for DMJM, an architectural and

engineering firm, in 1986. He was promoted to vice-president of the firm in 1989, a position he held until his termination in 1996. In 1992, Townsend was diagnosed with a terminal illness, chronic myeloid leukemia. Initially, Townsend did not disclose his illness, but later told two co-workers about it. According to Townsend, as word of his illness spread, he noticed a marked decrease in his autonomy and responsibilities. He testified that DMJM management began to pressure him to quit and apply for disability benefits. Dissatisfied with his options under standard DMJM disability policies, Townsend sought to negotiate an agreement that would allow him to go on disability, thereby reducing company overhead, while maintaining his insurance benefits until his death or age 65. Whether an agreement was reached between the parties, and its terms, is controverted.

Mr. Townsend testified that his primary intent in going on disability was to maintain his benefits until he died or turned 65. To this end, he told DMJM's president that he wanted to propose an alternate employment arrangement, and the president told him to work with William Cavanagh ("Cavanagh"), another vice-president and the company's chief financial officer. After discussing his situation with members of the company's benefits department, the human resources department, and other DMJM employees, Townsend came up with a plan. Townsend testified that his understanding of the plan was that it would enable

him to: (1) go on short-term disability for 90 days; (2) return to work after that time and then go on long-term disability during which time he would work eight hours per week at one-fifth of his previous salary; and (3) remain employed by DMJM until his death or age 65, whichever came first. This plan would be an exception to DMJM's usual policy that an employee generally must work a minimum of 30 hours per week to retain health and life insurance benefits.

On August 8, 1994, Townsend had a conference call with Cavanagh, Dolly Kelly (the Denver office manager), Linda Neilson (manager of human resources), and Gil Butler (another DMJM vice-president). The content of the call is disputed, with Townsend testifying that an agreement was reached with respect to all aspects of his plan, including duration of employment, and others testifying that duration was not specifically discussed.

The next day, Townsend sent a memo to Cavanagh confirming his understanding of the agreement. The memo included the all-important proviso that the arrangement "would be in effect until my death or retirement whichever occurs first." Cavanagh responded by memo that he was in "conceptual agreement as to a likely course of events," but stated that he "would delete [the section on employment until death or retirement] in its entirety because . . . it implies a guarantee of future employment and benefits, something DMJM is not authorized to do under any circumstances for any employee."

- 4 -

Townsend testified that he viewed the statement concerning duration as contrary to the purpose of the negotiated agreement–duration was integral. He regarded the statement as Cavanagh's opinion, rather than company policy, so he called Gerald Seelman ("Seelman") to discuss it. Seelman was the corporate vice-president (the second highest position in the company), and a personal friend. According to Townsend, he told Seelman of his concerns about Cavanagh's statement–without the duration term there was no agreement and he would not go on disability. According to Townsend, Seelman told Townsend to go on disability and not worry about the memo because "we have the agreement we talked about" and added "If you can't trust your friends, who can you trust?"

Based on these assurances, Townsend voluntarily relinquished his full-time position and shortly thereafter went on short-term disability. After 90 days of short-term disability, he returned to work for one day and went on long-term disability as scheduled. As part of his agreement, Townsend was to work eight hours per week at home while on long-term disability. At first, Townsend reviewed company documents, but the flow of work slowed and eventually stopped. Townsend testified that he continued to ask for work. Regardless, it is not disputed that DMJM stopped sending work, though Townsend continued to bill his time and DMJM continued to pay him.

In August 1996, Seelman told Townsend he did not know whether

Townsend could be kept on the payroll much longer. Townsend then reminded Seelman of the prior agreement, and Seelman said he would look into it. On September 28, 1996, Townsend received Seelman's letter terminating Townsend retroactively to August 30, 1996. Townsend tried to contact Seelman, but Seelman would not return his calls. Townsend brought this action against DMJM based upon breach of contract, promissory estoppel and the ADA. The jury awarded him damages of $303,787.00 on the breach of contract claim, while finding for DMJM on the other claims.

## Discussion

A. Contract Formation

DMJM first argues that it was entitled to judgment as a matter of law because the evidence will not support contract formation. Appellate review is de novo. See Greene v. Safeway Stores Inc., 98 F.3d 554, 557 (10th Cir. 1996). Judgment as a matter of law is appropriate "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." Vining v. Enterprise Fin. Group, Inc., 148 F.3d 1206, 1213 (10th Cir. 1998) (citation omitted). In reviewing, "we may not weigh the evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury." Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1522 (10th Cir.

1997). Additionally, the evidence and its inferences are construed in favor of the non-movant. See Kinser v. Gehl Co., 184 F.3d 1259, 1267 (10th Cir. 1999). Given these standards, the district court properly denied DMJM's motion for judgment as a matter of law.

DMJM makes four arguments on this issue. First, no offer and acceptance occurred because Townsend's first offer was rejected, and it was not renewed when Townsend spoke to Seelman. Second, even if the offer was renewed, Seelman's response was too vague to constitute an acceptance. Third, even if Seelman did accept the offer, Seelman was without authority to bind the company. Fourth, even assuming contract formation, it would be void for lack of consideration. For the reasons discussed below, each argument is rejected.

1. Offer and acceptance

Under Colorado law, "when the existence of a contract is in issue, and the evidence is conflicting or admits of more than one inference, it is for the jury to decide whether a contract in fact exists." I.M.A., Inc. v. Rocky Mountain Airways, Inc., 713 P.2d 882, 887 (Colo. 1986). This is just such a case. DMJM's sufficiency of the evidence argument discounts testimony by Townsend and other witnesses, that if believed, could establish the basis for a contract.

DMJM contends that Townsend's initial offer, contained in the memo sent

to Cavanagh on August 9, 1994, was rejected by Cavanagh's memo the following day. According to DMJM, Cavanagh's reply, rejecting one part (the duration) of the offer, constitutes a rejection of the whole offer. Generally, under the common law, rejection of one term of an offer constitutes a rejection of the entire offer. See Nucla Sanitation Dist. v. Rippy, 344 P.2d 976, 979 (Colo. 1959). However, this principle does not end the inquiry in this case.

The jury could have believed that the agreement was reached during the conference call on August 8, 1994. Townsend's testimony of an agreement reached on that day was corroborated by Dolly Kelly, DMJM's Denver office manager. She testified that Townsend's August 9, 1994 memo to Cavanagh, which she typed, "comported with her understanding of the agreement that had been reached." She further testified that the portion of Cavanagh's memo taking issue with the duration of the agreement was different from what she understood the agreement to be. When she voiced her concerns to Gil Butler, another vice president who had been involved in the conference call, he reportedly told her that "there is no reason to be concerned; it's a done deal. They'll take care of him. Everything is fine." If the jury believed the agreement was reached during the conference call, Cavanagh's August 10 memo could not have rejected an offer previously accepted, and DMJM's arguments concerning Seelman's lack of acceptance and inability to bind the company are not pertinent.

Had no agreement been reached during the conference call, DMJM argues that Seelman could not have accepted Townsend's August 9 offer (that had been rejected by Cavanagh), without Seelman's acceptance of each term. Stated another way, a contract could not be formed merely because Seelman agreed to Townsend's offer concerning duration, while Cavanagh had agreed to the other terms. Once the offer was rejected, it must be renewed again in its entirety before it can be accepted. See Baldwin v. Peters, Writer & Christensen, 349 P.2d 146, 147 (Colo. 1960).

Likwise, in order to establish the existence of a contract, the evidence must show that the parties agreed upon all essential terms. Federal Lumber Co. v. Wheeler, 643 P.2d 31, 36 (Colo. 1981). However, this evidence need not be as distinct as DMJM suggests. Rather, "evidence of the parties' conduct, their oral statements and their writings, and other evidence illuminating the circumstances surrounding the making of an agreement are admissible to clarify the intent and purpose of the parties." I.M.A., 713 P.2d at 888.

Townsend's testimony, by itself, was enough to allow the jury to find that a contract had been formed even assuming no prior agreement. The fact that some of his testimony was contradicted by other witnesses is irrelevant. Townsend testified that Seelman approved of the "till death or 65" duration of the arrangement, and told him not to be concerned with Cavanagh's memo. Townsend

testified that Seelman said "[D]on't worry about that…You know Bill Cavanagh, he's always got to protect the company and he's putting things in there and he thinks he's doing that now…Don't worry about it…It's fine…*We have the agreement we talked about*. That's the way it is." Aplt. App. at 409 (emphasis added). DMJM contends that no testimony shows that Seelman had a copy of Townsend's memo to Cavanagh nor that he had been participating in the negotiations previously, so there was no way for Seelman to know what the terms of the agreement were. But again, Townsend testified that he "reminded [Seelman] of what [the agreement] was." Aplt. App. at 408. Townsend also testified as to his sense of the conversation: "we had the agreement that we had previously agreed to, and he was assuring me that we still had it and that I could trust him and I could trust the agreement that we had." Aplt. App. at 410. When viewed against the close temporal proximity of the events in question and in context, the evidence, at the very least, presents a jury question.

2. Vague Language of Acceptance

DMJM next argues that, even if the offer was renewed by Townsend in his discussion with Seelman on August 12, 1994, Seelman's language was too vague to constitute an acceptance. The jury is entitled to consider the context in which Seelman's statements were made in determining whether he assented to

Townsend's proposal. Directly after Townsend told Seelman that he would not go on disability unless the duration of the agreement was until death or age 65, Townsend testified that Seelman told him "Don't worry about it...[w]e have the agreement we talked about...[g]o ahead and go on disability and be happy." Aplt. App. at 409. Under these circumstances, Seelman's words were entirely sufficient to indicate an intent to be bound. Cf. Embry v. Hargadine, McKittrick Dry Goods Co., 105 S.W. 777, 779-80 (Mo. Ct. App. 1907) (when an employee threatened to quit if he did not receive a contract extension, employer's statement: "Go ahead, you're all right" constituted assent as a matter of law because it was so unambiguous that a reasonable person would understand it to be an assent).

3. Seelman's Authority to Bind DMJM

DMJM next argues that, even if Townsend's offer was renewed and accepted by Seelman, Seelman did not have authority to bind DMJM. The existence of an agency relationship is generally a question of fact. See Stortroen v. Beneficial Fin. Co., 736 P.2d 391, 395 (Colo. 1987). An agent may have actual or apparent authority.

Seelman was the corporate vice-president at DMJM and, as such, was second in command only to the president. The jury could have found that, by virtue of his position and his involvement in the matter, Seelman had implied

- 11 -

negotiating authority.  Merely because Cavanagh had express actual authority to negotiate with Townsend at one level does not necessarily imply that Steelman lacked any implied authority at another level.  The jury certainly could have found that when Townsend was met by Cavanagh's rejection, Townsend simply went over Cavanagh's head to the second-in-command at the company and got the desired result.

The jury also could have found that Seelman possessed apparent authority based upon the company's entrusting him with second-in-command responsibilities and his superior position vis-a-vis Cavanagh and Townsend. Apparent authority is "that authority which the agent appears to third parties to have." Life Investors Ins. Co. of America v. Smith, 833 P.2d 864, 868 (Colo. Ct. App. 1992).  Under the concept of apparent authority, "a principal who by his words or conduct has caused another reasonably to believe that the principal has authorized his agent to take some action, is liable as if that action were authorized." Nation v. City & County of Denver, 685 P.2d 227, 229 (Colo. Ct. App. 1984).  DMJM argues against apparent authority because the principal did not engage in any conduct that could cause Townsend to believe Seelman was authorized.  However, "apparent authority can be created by appointing a person to a position, such as that of manager…,which carries with it generally recognized duties." Restatement (Second) of Agency § 27 cmt. a (1958).  "[T]o those who

- 12 -

know of the appointment there is apparent authority to do the things ordinarily entrusted to one occupying such a position, regardless of unknown limitations which are imposed upon the particular agent." Id. In fact, Seelman admitted at trial that it would be reasonable for Townsend to rely on him when he told him something in a work-related context. Aplt. App. at 1166.

Apparent authority does not exist unless the third party actually believes the agent is authorized. DMJM claims that Townsend admitted that he did not believe Seelman to be DMJM's authorized agent in the negotiations. In his deposition, Townsend testified that he did not think that Seelman would have authority to approve the disability arrangement, but at trial Townsend said that he "felt like either [the president of the company or Seelman] as officers of the company" could approve the arrangement. Aplt. App. at 506. Apparently, the jury chose to accord more weight to Townsend's trial testimony than to his deposition testimony.

Finally, DMJM argues that, as a matter of law, no apparent authority could exist because Townsend, as a vice president of DMJM with access to company policies, could not be a third-party entitled to rely upon the doctrine of apparent authority. No cases are cited for this proposition; regardless, it lacks factual support. Townsend was a subordinate of Seelman. As the corporate vice president and a member of the management committee of DMJM's parent

- 13 -

company, Seelman was in a position to have superior information to Townsend about the authorized duties of officers, especially once Townsend was no longer invited to high-level meetings (as he testified happened shortly before he began his negotiations).

## 4. Lack of Consideration

DMJM argues that any contract formed is not supported by consideration because Townsend admitted he was totally disabled. According to DMJM, Townsend repeatedly certified that he was totally disabled and unable to perform any work in applying for disability benefits and cannot have it both ways – claiming to be totally disabled for insurance purposes and claiming to be able to work part time as well. DMJM correctly states that Townsend's condition at the time of trial is not the deciding factor, but rather his circumstances when the contract was formed. However, whether Townsend was totally and permanently disabled at the time of contract formation is a question for the trier of fact. See Wilcott v. Matlack, Inc., 64 F.3d 1458, 1460-61 (10th Cir. 1995); Kirwan v. Marriott Corp., 10 F.3d 784, 790 (11th Cir. 1994); Delaney v. Union Carbide Corp., 749 F.2d 17, 19 (8th Cir. 1984).

To find for Townsend on his breach of contract claim, the jury had to find that, until he was discharged, Townsend performed his part of the contract.

Townsend's agreement called for him to go on short-term disability for three months, during which time he would do no work, followed by a return to work at eight hours per week and one-fifth of his previous salary. This is precisely what happened. Because the three-month short-term disability was part of the plan agreed to by DMJM, the fact that Townsend was certified as totally disabled during that period does not establish a lack of consideration, as he returned to work part time as agreed on the scheduled date. Townsend testified that, from the time he returned, he was available to work eight hours per week, just as provided for in the agreement.

DMJM relies heavily on Wilcott v. Matlack, Inc., 64 F.3d 1458 (10th Cir. 1995). In Wilcott, we affirmed the dismissal of a state law oral employment contract claim on the pleadings. See id. at 1465. This court indicated that statute of frauds problems existed, as well as a failure of consideration and damages because the plaintiff was totally and permanently disabled at the time of a single oral statement alleged to constitute the employment contract. See id. Despite DMJM's claims that the present case is "functionally identical" to Wilcott, it is plainly distinguishable. Wilcott involved judgment on the pleadings; here we have an entire trial with far more evidence about an actual agreement that contemplated part-time employment and quantifiable compensation. Moreover, the holding in Wilcott was based on the district court's underlying finding of fact

- 15 -

that Wilcott was totally and permanently disabled. Here, the jury's apparent finding was just the opposite: Townsend was found to be able to perform his part of the contract. Unlike the situation in Wilcott, both Townsend and his physician testified that, although he was disabled for purposes of long term disability, he was physically capable of performing the eight hours per week of sedentary work as called for by his contract.

5.  Lack of Special Consideration

On appeal, DMJM argues that the contract must fail because Townsend failed to present evidence of "special consideration" for his promise of lifetime employment. DMJM argues that it was unable to mention this point in its oral pre-verdict motion for judgment as a matter of law at the close of the evidence because the trial judge cut counsel short, indicating that "you've said enough for the court of appeals." Aplt. App. at 1182. Of course, counsel has a responsibility to make a record containing essential points, albeit respectfully, even given resistance by the trial judge. In the event the trial judge will not allow counsel to make a record, counsel should lodge an appropriate objection. The necessity of adequately developed argument is particularly true regarding a pre-verdict motion for judgment as a matter of law because one of the purposes of such a motion is to allow the non-movant an opportunity to consider, and perhaps correct,

deficiencies in its proof. See Morrison Knudsen Corp. v. Fireman's Fund Ins. Co., 175 F.3d 1221, 1259-60 (10th Cir. 1999).

Having reviewed the colloquy in question, which contains argument on the breach of contract claim, we are satisfied that the issue was not preserved. Most telling, DMJM never raised the issue of special consideration in its post-trial motion for judgment as a matter of law. Throughout the proceedings, from summary judgment to post-judgment, DMJM never argued the issue of special consideration. Its arguments on the issue of consideration were based solely on a claimed lack of consideration due to Townsend's disability. Thus, the suggestion that counsel was going to raise the special consideration issue pre-verdict is doubtful at best. Moreover, Townsend's addressing of special consideration in his response to DMJM's motion for summary judgment falls far short of DMJM informing the district court that DMJM claimed it was entitled to judgment on that basis.

B. Damage Award of Insurance Proceeds

DMJM appeals the denial of its motion for remittitur. "The trial court's denial of a motion for remittitur is entitled to considerable deference on appeal. We will not disturb this determination absent a gross abuse of discretion." Sheets v. Salt Lake County, 45 F.3d 1383, 1390 (10th Cir. 1995). "We will find such

abuse only if 'the jury award is so excessive ... as to shock the conscience and to raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." Roberts v. Progressive Independence, Inc., 183 F.3d 1215, 1224 (10th Cir. 1999) (quoting Sheets, 45 F.3d at 1390).

DMJM argues that Townsend failed to present evidence that he was likely to die before reaching age 65, thus, the award is speculative, and that the proper measure of damages is limited solely to what the employer would have paid in premiums on behalf of the employee. See Fariss v. Lynchburg Foundry, 769 F.2d 958, 964-66 (4th Cir. 1985). On the latter point, DMJM urges us to follow the rule that a claimant is limited to recovery of expenses incurred by "either replacement of the lost insurance or occurrence of the insured risk." Brunnemann v. Terra Int'l, Inc., 975 F.2d 175, 180 (5th Cir. 1992).

The district court did not abuse its discretion in denying DMJM's motion for remittitur. We cannot say that the award is speculative given the medical testimony in the record. Townsend's oncologist and primary care physician testified that Townsend was diagnosed with chronic myleoid leukemia in 1992, and became acutely ill in 1995, resulting in Townsend being "without adequate kidney function to sustain life" requiring chronic ambulatory peritoneal dialysis. See Aplt. App. at 739. In 1997, Townsend suffered a heart attack and also pneumonia, though not permanently damaging his health. See id. at 741. While it

is true that the physician testified that he could not predict how much longer Townsend would survive, or any other patient for that matter, he also indicated that the median survival is five years from diagnosis. See id. at 741-42. Even assuming (while in no way deciding) that Townsend was required to prove the likelihood of his death prior to 65, he did so.[*]

Insofar as the proper measure of damages, DMJM asserts that our review is de novo, because whether the face amount of the policy can be awarded is a matter of law. DMJM failed to preserve this issue. DMJM made a motion in limine to exclude all evidence concerning the life insurance policy. The court denied this motion, and DMJM did not appeal from this denial. DMJM also requested the court to instruct the jury to separate out any damages it awarded on the breach of contract claim, which the court also denied. DMJM never asked for a jury instruction relating its position on the proper measure of damages. Finally, in its post-trial motions, DMJM only raised this issue in its motion for remittitur; it did not claim legal error in either the evidentiary ruling or jury instructions. DMJM argues that technical precision in describing an argument is not required, and that the district court cut off its argument in the pre-verdict motion for judgment as a matter of law. As mentioned previously, these arguments are simply unavailing.

---

[*] Townsend did, in fact, die before he reached his 65th birthday.

Moreover, DMJM is hardly in a position to argue that the DMJM's group premiums on behalf of Townsend are the proper measure of damages. First, the record citations relied upon by DMJM for that amount pertain to Townsend's premiums had he been able to convert to an individual policy, not what the company would have paid. While we recognize that the additional amount payable by an employee in procuring substitute coverage may in some cases be a proper measure of damages, that is not the argument made here and DMJM takes the position on appeal that as a factual matter, perhaps because of actions by DMJM, Townsend's policy was not convertible to an individual policy. Aplt. Br. at 43 n.4. Regardless, merely awarding Townsend the premiums DMJM would have paid for this policy would not make him whole because he was unable to obtain replacement coverage.

C. Townsend's Cross Appeal

1. Front Pay Damages

Townsend argues that the district court erred in refusing to either award front pay damages or in not allowing the jury to hear evidence on the issue. At a bench conference during the testimony of Townsend's damages expert, the court said:

> Even on a contract claim, though, the question of front pay or reinstatement is for the Court, not for the jury. So I think we're

- 20 -

really going to have to do it up to the day of trial as to back pay and then leave it to my decision to decide on whether he's to be reinstated, which I certainly could order, if defendant – if plaintiff is successful, or if there is going to be front pay.

Aplt. App. at 784. Thereafter, the court said "I think we can probably tell the jury what we're doing. As a matter of law, I've asked the attorneys to have the witness figure damages up to the day of trial because front pay, if any, is for the Court, not for the jury, to decide." Aplt. App. at 786.

Despite these comments, the court correctly instructed that "To the extent that actual damages have been proved by the evidence, you shall award as his actual damages the amount of earnings and benefits Townsend would have received under the terms of the contract during the full term of the contract . . . ." Aplt. App. at 1261. It allowed the jury to award damages to Townsend for any losses he would have suffered as a result of the breach, including those from the date of the trial until his 65th birthday. The jury had sufficient information to make these calculations, because Townsend's damages expert testified as to the value of one month's lost wages, and he gave the jury the date on which Townsend would turn 65.

Townsend argues that the jury would have felt constrained from awarding these damages given the court's earlier remarks and the evidentiary presentation resulting from those remarks. The court's explanation to the jury following the bench conference never defined "front pay" and never specifically stated that the

explanation referred to contract damages. Indeed, the statement was correct as it related to Townsend's ADA claim, where front pay was an issue for the court to decide. The court's jury instruction on contract damages was the final word the jury heard, and it provided the opportunity for the jury to award damages on the full contract. The jury is presumed to follow the court's instructions. See Mason v. Oklahoma Turnpike Auth., 115 F.3d 1442, 1456 (10th Cir. 1997); United States v. Coleman, 7 F.3d 1500, 1506 (10th Cir. 1993). The jury also heard sufficient evidence to do the calculations. Thus, the court's statement about the calculation of contract damages during the bench conference, while incorrect as a matter of law, was harmless.

2. Emotional Distress

Townsend argues that the district court erred when it refused to instruct the jury that it could find damages for emotional distress on the breach of contract claim. The court's refusal to give a particular jury instruction is reviewed for an abuse of discretion. See United States v. Lee, 54 F.3d 1534, 1536 (10th Cir. 1995) (citing United States v. Vasquez, 985 F.2d 491, 496 (10th Cir. 1993)). Colorado courts do allow recovery for mental anguish arising from a breach of contract where that breach is accompanied by willful or wanton conduct. See Decker v. Browning-Ferris Indus., 931 P.2d 436, 448 (Colo. 1997); Trimble v.

City & County of Denver, 697 P.2d 716, 731 (Colo. 1985). The court recognized that this was a potential ground for recovery, but did not abuse its discretion in refusing to so instruct the jury. Townsend's requested jury instruction on mental anguish damages did not indicate that DMJM's behavior had to be willful and wanton to justify the award. Aplee. App. at 118. The court properly declined to give this instruction. Further, the court was justified in finding that Townsend did not present sufficient evidence of "an intentional breach, involving willful, wanton, or insulting conduct, and without any legal justification or excuse." Smith v. Hoyer, 697 P.2d 761, 764 (Colo. Ct. App. 1984). Given the reasonable factual and legal dispute of whether a contract existed, the court could have found that Townsend did not present sufficient evidence for the jury to find that DMJM's actions were based on "a wholly unreasonable interpretation" under the circumstances. Van Steenhouse v. Jacor Broadcasting, 935 P.2d 49, 54 (Colo. Ct. App. 1996), aff'd in part and rev'd in part on other grounds, 958 P.2d 464 (Colo. 1998).

### 3. Motion to Amend Complaint

As acknowledged by Townsend, his claim that the court erred in denying his motion to amend his complaint to add a claim of misrepresentation need not be considered because we have rejected all of DMJM's claims on appeal. See

Aplee/Cross Aplt. Br. at 61.

### 4. Award of Sanctions

As a sanction, the district court ordered Townsend to reimburse DMJM for half of its attorney's fees incurred in preparing a motion for sanctions – a total of $1117.50. The court determined that Townsend failed to supplement his initial disclosures as required under Fed. R. Civ. P. 26(e) by not disclosing the fact that he had applied for Social Security Disability benefits in October 1997. Townsend had been asked in his September 1997 deposition whether he had applied, and truthfully answered no. In a January 1998 deposition, he indicated that he had applied. Townsend's attorneys did not withhold this information from DMJM, because Townsend had not told them of his application. Nor did Townsend understand that he needed to supplement his deposition answer, because he did not believe the application to be relevant to any of his claims or DMJM's defenses. DMJM wanted to use his application for SSD benefits as evidence that he was totally disabled and, thus, could not be a qualified individual for purposes of his ADA claim. But, because his application was based on a "listed impairment" (end stage renal disease), no determination about his ability to work was made by the Social Security Administration before granting him benefits; thus, his receipt of benefits was not relevant to his claim that he was a qualified

individual.

In ruling on the motion for sanctions, the district court relied in part on Smith v. Blue Cross Blue Shield, 102 F.3d 1075 (10th Cir. 1996). The court interpreted the case as holding that one receiving SSD benefits was estopped from making an ADA claim. Though the question of judicial estoppel was not directly addressed in Smith, it was directly addressed in Rascon v. U.S. West Communications, Inc., 143 F.3d 1324, 1332 (10th Cir. 1998), a case decided after the district court ruled on the motion for sanctions. Rascon clarified the Tenth Circuit's position that application for Social Security disability benefits would not result in barring an ADA claim, though the application may be considered relevant to determining whether the applicant was a "qualified individual." Id. Because of this intervening clarification in the law, the general lack of culpability of Townsend and his attorneys, and the lack of harm to DMJM, the award of sanctions should be vacated.

The judgment on the jury's verdict is AFFIRMED. The case is remanded for the district court to vacate the sanctions order.