**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 28 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ROBERT D. GREENE,

    Plaintiff - Appellee and
    Cross-Appellant,

v.

SAFEWAY STORES, INC.,

    Defendant - Appellant and
    Cross-Appellee.

Nos. 99-1215 & 99-1228

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 94-N-691)**

---

Gregory A. Eurich, Holland & Hart LLP, Denver, Colorado (Marcy G. Glenn and Megan C. Bertron of Holland & Hart LLP, Denver, Colorado with him on the brief), for Defendant-Appellant and Cross-Appellee.

Thomas L. Roberts, Roberts & Zboyan, P.C., Denver, Colorado (JoAnne M. Zboyan of Roberts & Zboyan, P.C., Denver, Colorado; W. Randolph Barnhart, and Angela L. Ekker of Branney, Hillyard & Barnhart, Englewood, Colorado with him on the brief), for Plaintiff-Appellee and Cross-Appellant.

---

Before **BRISCOE** , **McWILLIAMS** , and **ALARCÓN** ,[*] Circuit Judges.

_____

**ALARCÓN** , Circuit Judge.

_____

Safeway Stores, Inc. ("Safeway"), appeals from the July 1997 judgment entered following a jury's verdict in favor of Robert Greene ("Greene"), a former Safeway employee. The jury found that Safeway engaged in willful discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), and awarded Greene $6.7 million in damages.

The first trial in this matter commenced on February 13, 1995. The district court granted Safeway's motion for judgment as a matter of law at the close of Greene's case-in-chief. On October 15, 1996, a panel of this court reversed and remanded the case for a new trial. This court held that the evidence presented was legally sufficient to support an inference of age discrimination. See Greene v. Safeway Stores, Inc. , 98 F.3d 554, 564 (10th Cir. 1996) [" Greene I "]. The retrial of the action began on June 2, 1997 [" Greene II "]. The district court denied Safeway's motions for judgment as a matter of law at the close of Greene's case-in-chief, at the close of all evidence, and after the jury found in favor of Greene.

---

[*] The Honorable Arthur L. Alarcón, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

Safeway appeals the denial of its motions for judgment as a matter of law. Because the evidence presented at the second trial was not substantially different from that presented at the first trial, we affirm. Safeway also appeals from the judgment awarding Greene $4.4 million for unrealized stock option appreciation. We conclude that the unrealized appreciation was compensable under the ADEA.

In his cross-appeal, Greene appeals from the district court's decision that the $4.4 million in unrealized stock option appreciation was not subject to doubling under the ADEA's provision for liquidated damages. We reject this contention and hold that the unrealized stock option appreciation was not an amount owing at the time of trial. We also uphold the district court's decision to deny prejudgment interest because an award of liquidated damages precludes an award of prejudgment interest.

I

Greene was born November 7, 1940. He went to work for Safeway as a courtesy clerk in 1957. In 1961, he became a produce manager at a Safeway store in Denver, Colorado. He became a store manager in 1966. Ten years later, he became a retail operations manager in Little Rock, Arkansas. Two years later, he returned to Denver as a retail operations manager. Five years later, Greene became a marketing operations manager in Houston. In 1986, Greene was appointed to the post of manager of Safeway's Denver Division.

On June 10, 1993, Greene was summoned to a meeting with Safeway's

president, Steven Burd, and Safeway's executive vice president, Kenneth Oder. Burd fired Greene at that meeting. Greene was then 52. A document introduced at trial entitled "Senior Executive Supplemental Benefit Plan" showed that Greene's interest in Safeway's supplemental executive pension plan would have vested a little over two years later, when he turned 55. Greene testified at the Greene II trial that Burd said that he was "assembling his new team and unfortunately, he didn't have a place for me on his team." Burd testified that he told Greene at the meeting that "he didn't fit in with the new management style." Greene testified that Burd told him at the meeting that Safeway would "give [him] the chance to resign if [he thought] that would be better."

The specific reasons Burd gave for firing Greene were that Greene was a poor merchandiser, that sales had flattened or declined at established stores in the Denver Division, that Greene was pessimistic about competition with another supermarket chain in Denver, and that Greene was intimidating to the employees he supervised. Burd, Oder, and Bob Kinnie, who had been Greene's direct supervisor, each testified at trial that he had not mentioned these concerns to Greene prior to his termination on June 10, 1993. Also in evidence at trial were three internal memoranda that praised Greene's work and the performance of the Denver Division. The memoranda were dated November 5, 1992, February 8, 1993, and April 6, 1993.

John King, a marketing operations manager from Safeway's Seattle

Division, replaced Greene as Denver Division Manager. King was 57 at the time. Denita Renfrew, a Denver Division employee, testified that King "seemed shocked" by his appointment to the position of Denver Division Manager. Renfrew testified that King said "he was very happy living in Seattle," that "he said he wanted to retire in Seattle," and that he indicated that he expected to be with the Denver Division for "a short period." King has remained with the Denver Division throughout the pendency of this litigation.

Greene elicited testimony and introduced documents showing that eight other executives left Safeway in the months leading up to and following Greene's termination. All eight men were in their fifties or sixties. Younger people succeeded all eight men.

Greene originally filed this action on March 24, 1994. The case proceeded to trial for the first time on February 13, 1995. At the close of Greene's case-in-chief, Safeway moved for judgment as a matter of law on Greene's ADEA claim. The district court granted Safeway's motion. This court reversed and remanded for a new trial. This appeal arises out of the judgment entered following the second trial in this matter. Safeway filed a timely notice of appeal. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

II

Safeway contends the district court erred in denying its motions for judgment as a matter of law. This court reviews de novo a denial of a motion for

judgment as a matter of law. See Townsend v. Daniel, Mann, Johnson & Mendenhall, 196 F.3d 1140, 1144 (10th Cir. 1999). The district court reasoned that judgment as a matter of law was unwarranted because, "[a]s a matter of logic and law of the case, the appellate court decision means, at a minimum, that, unless the plaintiff's second presentation fell short of the presentation at the first trial, plaintiff's case should get to the jury."

"The law of the case 'doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" United States v. Alvarez, 142 F.3d 1243, 1247 (10th Cir. 1998) (quoting United States v. Monsisvais, 946 F.2d 114, 115 (10th Cir. 1991) (quoting Arizona v. California, 460 U.S. 605, 618 (1983))). "Accordingly, 'when a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal.'" Id. (quoting Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1183 (10th Cir. 1995)). "This doctrine is 'based on sound public policy that litigation should come to an end and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided.'" Id. (quoting Gage v. General Motors Corp., 796 F.2d 345, 349 (10th Cir. 1986) (citations omitted)). The rule "also serves the purposes of discouraging panel shopping at the court of appeals level." Monsisvais, 946 F.2d at 116.

This court has recognized, however, that the law of the case doctrine is not an "inexorable command." Alvarez, 142 F.3d at 1247 (quoting White v. Murtha, 377 F.2d 428, 431 (5th Cir. 1967)). This court "will depart from the law of the case doctrine in three exceptionally narrow circumstances:

(1) when the evidence in a subsequent trial is substantially different;

(2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or

(3) when the decision was clearly erroneous and would work a manifest injustice."

See Alvarez, 142 F.3d at 1247 (citing Monsisvais, 946 F.2d at 117).

Here, Safeway argues that the evidence presented in Greene II was substantially different from that presented in Greene I. We are persuaded from our close examination of the record in Greene II that the same evidence was presented in Greene II that led this court to conclude in Greene I that the evidence was legally sufficient to support an inference of age discrimination.

Safeway first points to differences in witness testimony to support its argument that substantially different evidence was presented in Greene II. Safeway notes that Renfrew testified in Greene I that King, Greene's replacement, seemed "surprised" and planned to be around only for "a couple of years" and that she testified in Greene II that King seemed "shocked" and planned to be around only for "a short period." Safeway also notes that Greene testified in Greene I that Burd told him he did not fit in with the "new culture" and that there was no

-7-

place for him on the "new team" and that Greene testified only to the "new team" statement in Greene II. These are empty distinctions.

Safeway also makes much of the fact that the testimony of John Etchison corroborated Renfrew's recollection of King's reaction in Greene I but that his testimony did not corroborate hers in Greene II. In the opinion in Greene I, however, this court discussed Renfrew's testimony without mentioning Etchison's corroborating testimony. See Greene, 98 F.3d at 561-62. In sum, we conclude that the differences to which Safeway points are immaterial and insufficient to warrant a departure from the law of the case doctrine.

Contrary to Safeway's contention, the fact that Safeway had a chance to present its side of the story in Greene II does not make the evidence substantially different from that presented at the first trial. The rebuttal evidence Safeway introduced in Greene II is irrelevant to the question whether the evidence presented in Greene I continued to be legally sufficient to support a verdict for Greene in Greene II. See Townsend, 196 F.3d at 1144 (stating that, in reviewing the denial of a motion of judgment as a matter of law, this court "may not weigh the evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury").

In Greene I, this court held that the evidence Greene presented was legally sufficient to support a finding of discrimination. Nothing has changed. We therefore affirm the denial of Safeway's motions for judgment as a matter of law

in Greene II .

III

Safeway contends that the $4.4 million award of unrealized stock option appreciation must be vacated because such damages are not recoverable under the ADEA. In his cross-appeal, Greene contends that the district court should have doubled the $4.4 million award pursuant to the ADEA's liquidated damages provision. This court reviews the amount of damages awarded for clear error and determinations of law de novo. See Dill v. City of Edmond , 155 F.3d 1193, 1208-09 (10th Cir. 1998).

The jury awarded Greene a total of $6.7 million, which encompassed three categories of damages: (1) $600,000 for loss of salary, bonuses, and health insurance benefits; (2) $1.7 million for loss of retirement plan benefits; and (3) $4.4 million for unrealized stock option appreciation. On Greene's motion to alter or amend the judgment, the district court awarded an additional $810,786 under the ADEA's provision for liquidated damages. This amount was equal to the amount the jury awarded Greene for salary, bonuses, and employee and retirement benefits that Greene would have received before the June 1997 trial but for his termination. The district court declined, however, to double the $4.4 million awarded for unrealized stock option appreciation.

A

Safeway concedes in its brief that it first raised the argument that

unrealized stock option appreciation is not compensable under the ADEA in a post-trial motion. Greene argues that we should find the argument to have been waived. The district court, however, fully analyzed and responded to Safeway's argument in its order disposing of the post-trial motions of both parties. Moreover, the issue presented is one of law. We will therefore exercise our discretion to consider this argument. See Sussman v. Patterson, 108 F.3d 1206, 1210 (10th Cir. 1997) (noting that the "the general waiver rule is not absolute . . . and we may depart from it in our discretion" (quotations omitted)).

A stock option gives the option holder the right to buy a share of stock at a fixed "exercise price," typically the market price on the date the options are granted. See Susan J. Stabile, Motivating Executives: Does Performance-Based Compensation Positively Affect Managerial Performance?, 2 U. Pa. J. Lab. & Employment L. 227, 235 (1999). The value of an option is inherently fluid because it equals the difference in the exercise price and the market price. See id. The conferring of options on an executive creates an incentive for the executive to work hard to increase the market price of the employer's stock because that increases the value of the executive's stock options. See id. at 229-30. Stock options are an increasingly common form of executive compensation. See id. at 227-28. Options are often conferred in the place of more traditional forms of compensation like salary and require the executive to assume considerable risk. See id. Stock options are sometimes referred to as "contingent compensation."

See id. at 229-30.

At the time of his termination, Greene had 250,000 fully vested Safeway stock options. The exercise price was $1 per share. He also had roughly 250,000 more options that had not yet vested. The subscription agreement required Greene to exercise his vested options within ninety-five days of his October 15, 1993, separation from Safeway. Had he not exercised the vested options within ninety-five days, they would have expired. He exercised all of his vested options on December 21, 1993. He acquired Safeway stock with a market value in excess of $3,000,000. His gain on the transaction, on paper, was roughly $2,160,000. He immediately incurred a tax liability of roughly $850,000. See Commissioner v. LoBue, 351 U.S. 243, 248-49 (1956) (holding that gain realized on the exercise of incentive stock options is taxable income and that the gain is measured by the difference in the option price and the market value of the shares at the time the options were exercised, not at the time the options were granted).

Greene testified that, had he not been terminated, he would have refrained from exercising his stock options until shortly after November 7, 1995, the date he planned to retire upon reaching the age of 55. Greene testified that he sold all the shares he acquired within a few months of exercising his options because he needed cash to pay the Internal Revenue Service and because he was without income to cover his daily living expenses.

Leslie Patten, an accountant who was Greene's expert witness on damages,

testified that, had Greene exercised his vested options on January 31, 1996, instead of December 21, 1993, he would have reaped the benefit of increases in the market price of Safeway stock for an incremental gain in excess of $3,000,000. Patten also testified that, had Greene retired from Safeway in November 1995 as he planned, the options that had not yet vested at the time of Greene's termination would have vested and could have been exercised to purchase additional Safeway stock for a gain of more than $1,000,000.

The ADEA includes a broad remedial provision:

> In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section.

29 U.S.C. 626(b) (emphasis added). Deterrence and providing compensation for injuries caused by illegal discrimination are goals of the ADEA. See Dalal v. Alliant Techsystems, Inc., 182 F.3d 757, 760-61 (10th Cir. 1999) (citing McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 358 (1995)). "The purpose of the . . . remedies under the ADEA is to make a plaintiff whole--to put the plaintiff, as nearly as possible, into the position he or she would have been in absent the discriminatory conduct." Sandlin v. Corporate Interiors, Inc., 972 F.2d 1212, 1215 (10th Cir. 1992); see also Anderson v. Phillips Petroleum Co., 861 F.2d 631, 637 (10th Cir. 1988) (noting that making an ADEA plaintiff "whole"

means "returning him as nearly as possible to the economic situation he would have enjoyed but for the defendant's illegal conduct"); Blim v. Western Elec. Co., 731 F.2d 1473, 1480 (10th Cir. 1984) (holding that "fringe benefits" such as a company savings plan and eligibility for social security benefits "are proper damages under the ADEA").

An "Employment Agreement" dated February 15, 1988, provides that Safeway (1) agreed to employ Greene at his specified base rate of pay of $105,000 and (2) "further agreed to provide certain investment opportunities to Employee pursuant to a Subscription Agreement and the Stock Option Agreement referred to therein." Greene's stock options were a component of his compensation package. When Safeway terminated Greene's employment, it forced him to exercise his stock options sooner than he had planned to do so. The difference in the value of the options at the time Greene was forced to exercise them, and their value when he otherwise would have exercised them, is contingent compensation Greene would have received but for his termination. Failure to compensate Greene for his unrealized stock option appreciation would be a failure to "return[] him as nearly as possible to the economic situation he would have enjoyed but for the defendant's illegal conduct." Anderson, 861 F.2d at 637.

Safeway cites no case holding that stock options cannot be a basis for ADEA damages or that the appreciated value of the options is not the correct measure of damages. Instead, Safeway relies on a sentence in Commissioner v.

-13-

<u>Schleier</u>, 515 U.S. 323 (1995), a case in which the Supreme Court considered whether a recovery of damages under the ADEA is taxable income. In concluding that such a recovery is taxable income, the Court rejected the argument that it should apply the rule applicable to tort damages and hold that ADEA damages are similarly not taxable. In rejecting that argument, the Court explained that "the ADEA provides no compensation for any of the other traditional harms associated with personal injury, . . . . such as pain and suffering, emotional distress, harm to reputation, or <u>other consequential damages</u>." <u>Id.</u> at 335-36 (quotations omitted) (emphasis added).

Safeway argues that the unrealized stock option appreciation constituted "consequential damages" because Safeway had no control over the market price of its stock and Greene opted to sell his stock a short time after exercising his options. Safeway's argument is unpersuasive because Safeway conferred on Greene the right to buy shares of its stock at a set price. The value of that right to buy stock at a prefixed price went up and down with the market price of the stock. In forcing Greene to exercise the options earlier than he otherwise would have, Safeway curtailed Greene's right to choose the date on which he would exercise his right to buy stock in order to maximize his profit on the sale of the shares acquired.

Safeway argues in the alternative that the district court should have instructed the jury that Greene had a duty to mitigate his unrealized stock option

-14-

appreciation by holding on to the shares of stock he acquired and hoping the market price of the stock would not decrease. Rule 51 of the Federal Rules of Civil Procedure provides:

> No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

Fed. R. Civ. P. 51. Here, the transcript of the jury instruction conference includes a discussion about whether the district court should give the jury such a mitigation instruction. In that discussion, counsel for Safeway stated that there was a "major mitigation issue on the stock options." The district court replied that it believed the issue was one of proximate cause rather than mitigation. The district court then read a proximate cause instruction to the lawyers, and asked the lawyer for each side if they want the court to give that instruction. Both lawyers said yes. The district court then said to Safeway's counsel, "in that case, Mr. Eurich, I will leave out any mitigation on the stock options and let you argue that as an issue of causation. If we stick mitigation in there, I'd be confused if I got that instruction, and so the jury is bound to be confused, I think." Safeway's counsel said nothing further.

Rule 51 is satisfied by an oral objection sufficient to call the error to the district court's attention. See Unit Drilling Co. v. Enron Oil & Gas Co., 108 F.3d 1186, 1190 n.5 (10th Cir. 1997) (citing Taylor v. Denver & Rio Grande W. R.R. Co., 438 F.2d 351, 353 (10th Cir. 1971)). Here, Safeway assented to the use of a

proximate cause instruction in lieu of a mitigation instruction and never offered any reason for the district court to believe that the failure to instruct on mitigation was legal error. Accordingly, Safeway failed to comply with Rule 51. Thus, we review the failure to give a mitigation instruction for plain error. Under that standard, we will affirm unless the instructions were "patently, plainly erroneous and prejudicial." See id. at 1190 (quotations omitted). We conclude that, where the district court gave a proximate cause instruction, the failure to give a mitigation instruction is not patently, plainly erroneous and prejudicial. See McCue v. State of Kan. Dep't of Human Resources, 165 F.3d 784, 790 (10th Cir. 1999) (holding that there was not plain error where the district court declined to grant a requested instruction that "retaliation is the sole basis on which you may award damages" but gave an instruction that "you may award damages only for injuries the plaintiff proves were caused by the defendant's retaliation").

Finally, Safeway contends that the jury's award was too speculative. "In reviewing a jury's award of damages, this [c]ourt should sustain the award unless it is clearly erroneous or there is no evidence to support the award." Sanjuan v. IBP, Inc., 160 F.3d 1291, 1299 (10th Cir. 1998) (quotations omitted). The jury's award of $4.4 million in stock option damages is close in amount to the tabulations presented by Greene's expert witness on damages, Leslie Patten. Patten's testimony supports the award.

B

-16-

In his cross-appeal, Greene contends that the district court erred in concluding that the $4.4 million in damages the jury awarded for unrealized stock option appreciation was not subject to doubling under the ADEA's provision for liquidated damages.    The remedial provision of the ADEA incorporates by reference relevant provisions of the Fair Labor Standards Act ("FLSA"), including the FLSA's provision for liquidated, or double, damages for "amounts owing" at the time of trial.    See 29 U.S.C. § 626(b).  Under the FLSA, an award of liquidated damages is mandatory except where the employer shows it acted in good faith.   See Blim, 731 F.2d at 1479 n.1 (citing 29 U.S.C. § 260).  In such a case, the court has discretion to award liquidated damages.    See id.

Under the ADEA, however, "liquidated damages shall be payable only in cases of willful violations."    See § 626(b); Spulak v. K Mart Corp.   , 894 F.2d 1150, 1159 (10th Cir. 1990).  Once a violation of the ADEA is determined to be willful, an award of liquidated damages is mandatory.    See Bruno v. Western Elec. Co. , 829 F.2d 957, 967 (10th Cir. 1987) ("[I]n section 626(b), Congress provided that in cases of willful violations of the ADEA the court would order liquidated damages.").  We have held, however, that not all forms of relief available under the ADEA are subject to this mandatory doubling:

> Parsing the statutory language of § 626(b) reveals that it provides two types of relief.  First is "amounts owing" as unpaid wages or unpaid overtime compensation.  Section 216(b) instructs that the items to be doubled as liquidated damages are unpaid wages or unpaid overtime compensation.  Thus for a monetary award to qualify for doubling as liquidated damages it must be an "amount

-17-

owing" under § 626(b).

The second type of relief permitted, including front pay, is not found in the "amounts owing" provision of § 626(b), but in the following sentence: "[T]he court shall have jurisdiction to grant such <u>legal or equitable</u> relief as may be appropriate . . . ." 29 U.S.C. § 626(b) (emphasis added). We have said this sentence "makes a significant addition to the FLSA remedies" referred to by the "amounts owing" language, <u>EEOC v. Prudential Federal Savings & Loan Ass'n</u>, 763 F.2d 1166, 1171 (10th Cir.1985). Because the authority to grant front pay as a remedy stems not from the "amounts owing" language but from the additional power to grant appropriate legal and equitable relief, we conclude that the statute does not contemplate the doubling of front pay awards as liquidated damages in cases of willful violations.

<u>Cooper v. Asplundh Tree Expert Co.</u>, 836 F.2d 1544, 1556-57 (10th Cir. 1988).

By the time of the June 1997 trial, all the dates relevant to the calculation of Greene's unrealized stock option appreciation were in the past. Greene actually exercised his options in December 1993. But for his termination, he would have exercised them shortly after his November 1995 retirement. We are nevertheless persuaded that the $4.4 million the jury awarded Greene for unrealized stock option appreciation is more like front pay than it is like back pay and that it therefore falls within the second category of ADEA damages described above.

An award of front pay is based on speculation. <u>See</u> <u>Blim</u>, 731 F.2d at 1479 ("[A]n award of front pay is always somewhat speculative."); <u>id.</u> at 1481 ("The front pay damages are too uncertain to be considered 'lost wages' or 'lost earned benefits.' The possibilities of promotions, legitimate demotions, terminations, or

-18-

death inject too many unknowns. In these circumstances the award of front pay is too speculative to be considered pecuniary damages under the [ADEA].") (Seth, C.J., concurring and dissenting). An award of damages for unrealized stock option appreciation is similarly speculative. It was only through Greene's testimony in this action that Safeway learned Greene would not have exercised his vested options until shortly after his planned November 1995 retirement. Moreover, as Safeway points out, Greene's expert witness somewhat arbitrarily chose the market price on January 31, 1996, as the foundation of his calculations of Greene's unrealized appreciation. The date chosen is critical: Safeway asserts in its brief to this court that Greene's unrealized appreciation would have been $842,000 less had Patten used the market price from two weeks earlier.

Safeway cannot be charged with pretrial knowledge of the date on which Greene would have exercised his options had he not been terminated. This issue of fact had to be litigated before the amount of Greene's unrealized appreciation could be ascertained. We therefore decline to characterize Greene's lost appreciation damages as an amount owing at the time of trial that would be subject to doubling under the liquidated damages provision of the ADEA.

C

Greene also cross-appeals the district court's decision to deny prejudgment interest. This court reviews the district court's decision for abuse of discretion

-19-

and will reverse only if left with a definite conviction that the district court clearly erred in its judgment. *See* Suiter v. Mitchell Motor Coach Sales, Inc. , 151 F.3d 1275, 1288 (10th Cir. 1998).

Prejudgment interest is not recoverable as a matter of right. *See* *id.* 1288-89. "[T]he rationale underlying an award of prejudgment interest is to compensate the wronged party for being deprived of the monetary value of his loss from the time of the loss to the payment of the judgment." *Id.* at 1288 (quotations and alterations omitted). In deciding whether to award prejudgment interest, "the district court must first determine whether an award of prejudgment interest would serve to compensate the wronged party." *Id.* at 1289.

Here, the district court followed the law of the circuit that "prejudgment interest is not available under the ADEA if plaintiffs receive liquidated damages." *See* Blim, 731 F.2d at 1479. The district court also found in its discretion that an award of prejudgment interest was unwarranted. The district court reasoned that, "[h]aving awarded liquidated damages on all amounts which I find to be 'amounts owing,' I see no reason to add money for prejudgment interest." We find no abuse of discretion.

The judgment of the district court is AFFIRMED.