**ORACLE CORPORATION, a Delaware corporation, Plaintiff,**

v.

**Pier C. FALOTTI, an individual, Defendant.**

**No. C 00–02345 WHA.**

United States District Court, N.D. California.

Sept. 17, 2001.

W. Chelsea Chen, Steptoe & Johnson LLP, Los Angeles, CA, for Plaintiff.

E. Jeffrey Banchero, Banchero Law Firm LLP, San Francisco, CA, Richard A. Johnston, Jonathan D. Rosenfeld, Marc N. Henschke, Hale & Dorr LLP, Boston, MA, for Defendant.

**ORDER GRANTING PLAINTIFF ORACLE CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING DEFENDANT PIER C. FALOTTI'S CROSS–MOTION FOR PARTIAL SUMMARY JUDGMENT**

ALSUP, District Judge.

### INTRODUCTION

In this employment case involving both Swiss and California law, this order **GRANTS** plaintiff's motion for partial summary judgment and **DENIES** defendant's cross-motion for partial summary judgment.

### STATEMENT

Plaintiff Oracle Corporation seeks a declaratory judgment that it does not owe any unvested stock options to defendant Pier Carlo Falotti, a former high-level executive, who Oracle terminated. Mr. Falotti claims that he is entitled to unvested stock options (or their value) for breach of his employment contract or Oracle's stock-option plan. Both parties have filed cross-motions for partial summary judgment on the issue of entitlement to stock options, although Mr. Falotti seeks only to establish his right to options vesting no later than September of 2000, three months after Oracle told him he was terminated. Oracle also seeks summary judgment on Mr. Falotti's oral-contract and promissory-estoppel counterclaims under California law.

In 1996, Mr. Falotti was hired as Senior Vice President of EMEA, an unincorporated business division of Oracle Corporation, encompassing Oracle's European, Middle Eastern and African operations. Subsequently, he was promoted to Executive Vice President of EMEA and made a member of Oracle's Executive Committee. At the outset of his employment, he and Oracle entered into the contracts that provide the basis for this dispute: an employment contract governed by Swiss law, and a stock-option agreement controlled by California law.

Oracle notified Mr. Falotti of his termination on May 31, 2000. Subsequently, the committee that administered Oracle's stock-option plan determined that Mr. Falotti was not entitled to any stock options vesting after that date. In this action, Mr. Falotti argues that he was entitled to stock options vesting between June and September of 2000 (or their value) for two main reasons. First, he contends that Oracle's stock-option committee abused its discretion by determining that he was terminated on May 31, 2000, when under Swiss law, he should have been considered to be employed by Oracle until September 30. Sec-

ond, he maintains that he was entitled to the value of the stock options vesting between June and September of 2000 as damages for the breach of his employment contract.

This order holds that Mr. Falotti is not entitled either to the unvested stock options or to their value. Mr. Falotti agreed up front as to what stock options he would receive upon termination before vesting. That agreement is dispositive to his stock-option claim. As an independent and alternative ground, the various stock-option grants conferred on Oracle's stock-option committee the authority to determine when Mr. Falotti ceased to be a "full-time employee." The record does not show that the committee abused its discretion in ruling against Mr. Falotti. Other points of contention will be discussed below.

### The Employment Contract

Mr. Falotti began to negotiate his employment contract with Oracle in April of 1996 (Falotti Decl., dated Sept. 21, 2000, ¶ 6). On May 21, 1996, Oracle sent him an offer letter, which he declined to accept (*ibid.*). Oracle sent him a new offer letter on July 2, 1996, which he accepted and signed on July 10, 1996, a key exhibit herein.

The letter agreement gave Mr. Falotti the position of Senior Vice President of Europe, Middle East and Africa. It stated that Mr. Falotti would receive a base salary with incentives, and that (Henschke Decl., Exh. 1, at 2):

> Following your acceptance of this offer by Oracle, we will agree on an employment contract that will be subject to Swiss law. The terms of the contract will include: (1) the start date of your employment, (2) your accrual of vacation at the rate of twenty days per year, (3) the provision by Oracle to you of benefits (including pension) tailored to your

needs at a cost not to exceed 20% of your on-target earnings, and (4) during your employment, the leasing for your use of a car equivalent to the BMW 750iL.

The letter agreement also discussed stock options. It stated: "We will submit to the Board of Directors on July 15, 1996, a request to approve a grant to you of an option to purchase 600,000 shares.... The option will be issued under a written agreement and will be subject to qualification under all applicable securities regulations" (*id.* at 1).

The letter agreement further provided (*id.* at 1–2):

> If you remain continuously employed by Oracle, you will be eligible to exercise your right to purchase the 600,000 option shares granted herein according to the following vesting schedule:
>
> at six months from your starting date: 25%
>
> at 18 months from your starting date: 50%
>
> at 36 months from your starting date: 75%
>
> at 48 months from your starting date: 100%

Stock option grants shall be provided from time to time as the board approves in its discretion commensurate with its evaluation of your contribution and responsibilities an the financial health of the company.

The letter also promised the following severance package, which had not been included in Oracle's original offer letter (*id.* at 2) (emphasis added): [1]

> Further, the contract shall provide that if Oracle terminates your employment without cause Oracle will provide you total severance as follows: (1) payment of one year's on-target earnings as set

---

1. Compare with Falotti Decl. dated Sept. 21, Exh. A.

forth herein ($1,000,000), payable in twelve equal monthly installments, (2) *if such options have not already vested, accelerated vesting of the first 50% of the stock option grant as set forth herein,* and (3) provision to you of health care coverage and pension payments for one year from your termination date. As stated, Mr. Falotti countersigned this offer letter on July 10, 1996. As will be shown, this express provision is important in resolving this case.

In addition to the letter agreement, three other documents comprised Mr. Falotti's employment contract. The second document comprising his employment contract was a letter from Lawrence Ellison, Chairman and Chief Executive Officer of Oracle, and Raymond Lane, former President of Oracle, dated August 29, 1996, and signed by Mr. Falotti on September 10, 1996. It provided: "Your employment will be governed by the laws of Switzerland" (Henschke Decl., Exh. 2, at 1). Under "remuneration," it stated Mr. Falotti's annual base and on-target earnings and that an attached employment agreement would govern the terms of his employment (*ibid.*). Attached to the letter was the third document comprising his employment contract, the employment agreement. It was also signed by Mr. Falotti on September 10, 1996, and related primarily to trade secrets.

The fourth document comprising Mr. Falotti's employment contract was a letter from Mr. Lane, dated September 9, 1996, and signed by Mr. Falotti on September 10, 1996. It stated: "The purpose of this letter is to clarify how the various letters and agreements relate to one another" (Henschke Decl., Exh. 4, at 1). It explained: "the terms of your remuneration outside Switzerland shall be in accordance with the letter dated 2nd July, 1996, from

myself and signed by you on 10th July 1996, ('the Letter')" (*ibid.*). It further provided (*id.* at 2):

> In the event of any dispute between the Swiss law agreement and the Letter, the terms of the Letter shall prevail.... Furthermore, if Oracle terminates the Employee Agreement without cause the terms of the Letter shall prevail.

> You further agree that any notice payable for termination without cause payable under your Swiss Employment Agreement shall be waived providing the payment due under the Letter shall have been paid.

### The Stock–Option Agreement

Seven documents further addressed stock options. The first was entitled, "Oracle Corporation Non–Qualified Stock Option Grant Agreement," dated September 13, 1996 (Henschke Decl., Exh. 9). It provided, as promised in the offer letter, that Mr. Falotti was to receive 600,000 stock options, broken into four tranches of 150,000 shares each. The first tranche was scheduled to vest on March 13, 1997. The last tranche, the one at issue in this action, was scheduled to vest on September 13, 2000.

Subsequently, Oracle and Mr. Falotti entered into three similar grant agreements for smaller lots of options. The first, dated July 11, 1997, granted Mr. Falotti an additional 25,000 stock options due to vest on July 11 every year thereafter, up until the year 2001. The second, dated July 10, 1998, granted Mr. Falotti an additional 50,000 stock options due to vest on July 10 every year thereafter, up until the year 2002. The third, dated November 20, 1998, granted Mr. Falotti an additional 50,000 stock options due to vest on November 20 every year thereafter, up until the year 2002.[2] All four grant agree-

---

**2.** Mr. Falotti was also granted other stock options, including options vesting on June 4, 2000, but the agreements for these options are not in the record (Cooper Decl., Exh. 28).

ments were printed on a standard form, which provided that they were "subject to the terms and conditions attached hereto," and "subject to all the terms and conditions of the Company's 1991 Long–Term Equity Incentive Plan as amended to date" (*ibid.*). All four grant agreements were signed by Mr. Falotti and Bruce Lange, Oracle's Vice President and Corporate Treasurer.

The fifth document, one of the two documents incorporated by reference into the grant agreements signed by Mr. Falotti, was entitled "Oracle 1991 Long–Term Equity Incentive Plan" (Henschke Decl., Exh. 6). It contained questions and answers about the stock-option plan, and contained definitions of some of the terms. It explained that a compensation committee formed of members of Oracle's board of directors would administer the plan (*id.* at F0027). Its description of the stock-option plan was the same as the terms and conditions, which were attached to the grant agreements.

The sixth document, entitled "1991 Long–Term Equity Incentive Plan, Terms and Conditions" was appended to the grant agreements signed by Mr. Falotti and incorporated by reference (Henschke Decl., Exh. 7). It set forth the terms and conditions of the stock-option plan. Section 3 was entitled "Termination of Option." It provided (*id.* at 1):

Except as provided below in this Section, this Option shall terminate and may not be exercised if Optionee ceases to be employed by the Company or any Parent or Subsidiary or Affiliate of the Company. Optionee shall be considered to be employed by the Company for all purposes under this Section 3 if Optionee is an officer, director or full-time employee of the Company or any Parent, Subsidiary or Affiliate of the Company or if the Board determines that the Optionee is rendering substantial

services as a part-time employee, consultant, contractor or advisor to the Company or any Parent, Subsidiary or Affiliate of the Company. The Board shall have discretion to determine whether Optionee has ceased to be employed by the Company and the effective date on which such employment terminated.

It further stated (*id.* at 3):

Any dispute regarding the interpretation of this Grant shall be submitted by Optionee or the Company forthwith to the Board or the committee thereof that administers the Plan, which shall review such dispute at its next regular meeting. The resolution of such a dispute by the Board or committee shall be final and binding on the Company and on Optionee.

The terms and conditions also contained an integration clause, which read (*id.* at 4): "The Plan and Notice and Exercise Agreement attached hereto are incorporated herein by reference. This Grant, the Plan and the Notice and Agreement constitute the entire agreement of the parties and supersede all prior undertakings and agreements with respect to the subject matter hereof."

The seventh document was a form entitled Oracle Corporation Stock Option Exercise Notice and Agreement. Mr. Falotti signed this agreement every time he exercised stock options, most recently on April 5, 2000. The form contained an integration clause and choice-of-law provision, which read: "The Plan and Grant are incorporated herein by reference; this Agreement, the Plan and the Grant constitute my entire agreement with the Company and supersede all prior undertaking and agreements between us with respect to the subject matter hereof; this Agreement is governed by California law except

for that body of law that pertains to conflict of laws" (Cooper Decl., Exh. 9, at 3).

In sum, Mr. Falotti signed grant agreements in September of 1997, July of 1997, July of 1998, and November of 1998. The grant agreements incorporated by reference two separate documents: the 1991 Long–Term Equity Plan, and the 1991 Long–Term Equity Plan Terms and Conditions. Every time Mr. Falotti exercised a stock option, he signed an Exercise and Notice Agreement, which also incorporated by reference the grant agreement, the 1991 Long–Term Equity Plan, and the 1991 Long–Term Equity Plan Terms and Conditions.

### Mr. Falotti's Departure

In January of 2000, Mr. Falotti and Mr. Ellison began discussing various plans to have Sergio Giacoletto assume many or all of Mr. Falotti's duties, with Mr. Falotti assisting or training him (Ellison Dep. 154). According to Mr. Falotti, although compensation was not discussed, the two reached an oral agreement, whereby Oracle guaranteed him full-time employment from June 1, 2000, through June 1, 2001 (Falotti Dep. 197). According to Mr. Lane, Mr. Falotti's former boss (Lane Dep. 76–77):

> The plan I had developed with Pier Carlo was to work halfway through the new fiscal year [May 31, 2000 to May 31, 2001], or work half time for the whole year, but that we would name Sergio Giacoletto as the new head of EMEA, and that Pier Carlo would be there to mentor him and to do customer activities and things like that. . . . I didn't think we should pay somebody full time at this rate . . . So I told Larry my feelings, that I though he was wrong in this decision, and he said, "Well, that's what we've agreed to." So I called Pier Carlo back and said, "It's a done deal."

Mr. Falotti states that Mr. Ellison subsequently affirmed their agreement in the beginning of April, when he asked Mr. Ellison about it (Falotti Dep. 206–09).

Mr. Ellison, on the other hand, maintains that he was "intentionally ambiguous" with Mr. Falotti and denies reaching any definitive agreement with him (Ellison Dep. 155, 162). According to Mr. Ellison, by January of 2000, he had decided to terminate Mr. Falotti as soon as this could be done without hurting business in Europe (*id.* at 152–54). As of January, however, he had not ruled out the possibility of retaining Mr. Falotti in a different role than Executive Vice President, EMEA, to create a smooth transition in management. In his deposition, Mr. Ellison testified, "I didn't know if we needed Pier Carlo at that point for a year of transition or not. So I was keeping my options open" (*id.* at 154). At some point in time, Oracle's attorneys explained that Mr. Falotti could not be given a consulting job, because he would continue to vest in tens of millions of dollars worth of stock options every year (*id.* at 244–45). Thereafter, Oracle began contemplating Mr. Falotti's termination. Several termination letters were drafted, but none was ever sent.

On May 30, 2000, Mr. Falotti sent an email to Mr. Lane, stating: "Here is the announcement I will send out on June 1" (Moore Decl., Exh. H, at 1). The announcement stated that Mr. Falotti had decided to transfer all of his operational responsibilities to Mr. Giacoletto, so that Mr. Falotti could devote all his time to activities such as "helping the Account Management to reach higher levels of decision-makers in our customer base" and "strengthening management contacts with our partners" (*id.* at 1–2).

On the same day, Mr. Falotti visited his doctor, Raymond Hadorn, whom he had not seen for almost three years. The appointment was made by his wife, who had contacted Dr. Hadorn the day before, stat-

ing that Mr. Falotti was depressed and needed an appointment quickly. According to Dr. Hadorn, Mr. Falotti slumped in a chair and cried during the visit. Dr. Hadorn diagnosed Mr. Falotti with deep depression, resulting in a total incapacity to work. He gave Mr. Falotti a certificate stating this diagnosis. After leaving the doctor, Mr. Falotti returned to Oracle and worked until 7:30 in the evening. That night, he sent business emails from his home until 10:51 p.m.

Under Swiss law, any attempt to terminate an employee who cannot work due to illness is "null and void." Such incapacity is commonly proven by a medical certificate similar to the one provided by Dr. Hadorn.

Mr. Falotti worked on the morning of May 31, 2000. Later in the day, he returned a phone call from Vance Kearney, Vice President of Human Resources, EMEA. Mr. Kearney told Mr. Falotti that he was being terminated immediately (Kearney Dep. 224). According to Mr. Kearney, Mr. Falotti refused an offer of stock options due to vest in June and July in exchange for his retirement, stating "that's not acceptable, you know, I'll discuss this with Larry" (*ibid.*). Mr. Falotti then called his attorney and subsequently Mr. Ellison. According to Mr. Falotti, Mr. Ellison told him he was being terminated because he was "too expensive for his job" (Falotti Dep. 269). Mr. Ellison refused to honor the prior arrangement to retain Mr. Falotti through the fiscal year of 2001 and would not discuss the matter further, Mr. Falotti states. Mr. Ellison, on the other hand, states that in response to Mr. Ellison's offer of stock options due to vest in June and July (775,000 shares), Mr. Falotti responded that he wanted the stock options due to vest in September (1,350,000 shares) as well as those earlier. According to Mr. Ellison, when he refused the counterproposal, Mr. Falotti said: "You can't

terminate me because I'm sick.... I've got a headache.... You don't work in Switzerland as long as I have without being familiar with Swiss law" (Ellison Dep. 213).

As of May 31, Mr. Falotti was relieved of his duties and performed no active work for Oracle. On May 31, Oracle changed his password and began clearing out his office (Boskin Dep. 154). On June 5, 2000, Mr. Falotti sent Dr. Hadorn's note to Oracle via certified mail. Oracle responded on June 22 with two letters. One stated that Mr. Falotti had been terminated as of May 31. The other read: "In case you persist in alleging that you are sick, you will be invited for a medical examination in due course" (Henschke Decl., Exh. 41). The same day, Mr. Falotti was admitted to La Ligniere hospital. La Ligniere released Mr. Falotti on July 5. Two days later, Mr. Falotti visited Dr. Hadorn, who declared him once again fit to work as of July 10. On July 7, Mr. Falotti's attorney wrote Oracle stating that Mr. Falotti would submit to a medical examination by a mutually-agreeable doctor, but that Mr. Falotti would be on vacation until August 4. No examination was ever performed.

### The Determination by the Stock–Option Committee

The committee that administered Oracle's stock-option plan convened a special meeting by telephone on June 30 to determine whether Mr. Falotti was entitled to any stock options vesting after May 31. The committee was comprised of two of Oracle's outside directors: Michael Boskin and Donald Lucas. Also attending were Oracle's general counsel, Daniel Cooperman, and outside counsel from the law firm representing Oracle in the present litigation, Theodore Rhodes. Prior to the meeting, the committee members were provided with an information packet containing: (i) the offer-letter agreement

signed by Mr. Falotti on July 10, 1996; (ii) the letter agreement dated August 29, 1996, and the attached employee agreement; (iii) the letter dated September 9, 1996, clarifying the relationship between Mr. Falotti's prior employment agreements; (iv) excerpts from the Oracle 1991 Long–Term Equity Incentive Plan; and (v) the letter dated June 22, 1996, from Oracle, stating that Mr. Falotti's termination was effective as of May 31, 2000. The minutes of the committee meeting read in part (Henschke Decl., Exh. 46):

> Mr. Rhodes explained the background of the situation involving Mr. Falotti including the notice of termination, effective immediately, delivered by Mr. Ellison to Mr. Falotti on May 31, 2000, and the subsequent note produced by Mr. Falotti from his doctor indicating that Mr. Falotti was unable to perform his duties as of May 30, one day preceding the date notice was given by Mr. Ellison. Mr. Rhodes explained that under Swiss law notice of termination may not be effective if given while the employee is unable to work. Mr. Rhodes suggested to the Committee that it needed to interpret whether Mr. Falotti ceased to be employed for purposes of the Plan regardless whether the notice provided was effective under Swiss law. He pointed out that the purpose of the Plan, as set forth in Section 1 of the Plan, is to provide an incentive to eligible employees whose present and potential contributions are important to the success of the Company and to enable the Company to continue to enlist and retain in its employ the best available talent.. : .
>
> Mr. Lucas asked whether there was any additional information that they should know. Mr. Rhodes indicated that based on his investigation, there has never been another interpretation of this provision, so this is an issue of first impression.

> The Committee, after deliberation, unanimously decided that for purposes of the Plan, Mr. Falotti ceased his employment with Oracle on May 31, 2000.

\* \* \* \* \* \*

On July 3, 2000, Oracle filed suit herein for a declaration that it does not owe Mr. Falotti any more stock options beyond those vesting on or before May 31, 2000. On September 1, 2000, Mr. Falotti filed suit against Oracle in Swiss labor court, still pending. He also filed counterclaims herein under Swiss and California law. After two motions to dismiss, his remaining counterclaims under California law are for: (i) a declaration that he is entitled to stock options; (ii) breach of contract; and (iii) promissory estoppel. He also contends that Oracle has violated the Swiss Code of Obligations Article 335c, which entitles an employee to a two-month notice period before his or her termination becomes effective, and the Swiss Code of Obligations Article 336c, which prohibits terminating an employee who cannot work due to illness.

## ANALYSIS

Summary judgment must be granted insofar as no genuine issue of material fact exists and no reasonable trier of fact could find other than for the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party may seek summary judgment on "all or any part" of an action. Fed.R.Civ.P. 26(a). The moving party has the initial burden of production. It may carry this burden in either of two ways: it may offer evidence disproving an element of the plaintiff's case, or it may show the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the

depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 323–324, 106 S.Ct. 2548 (internal quotations omitted).

## I. Severance Agreement

■ Mr. Falotti has raised a number of arguments regarding the interplay of Swiss law and the stock-option agreement. The dispositive contract in this action, however, is the express severance agreement Mr. Falotti negotiated. Regardless of when Mr. Falotti's termination became effective under Swiss law, he was entitled to the following total severance (Henschke Decl., Exh. 1, at 2) (emphasis added):

> if Oracle terminates your employment without cause Oracle will provide you total severance as follows: (1) payment of one year's on-target earnings as set forth herein ($1,000,000), payable in twelve equal monthly installments, (2) *if such options have not already vested, accelerated vesting of the first 50% of the stock option grant as set forth herein,* and (3) provision to you of health care coverage and pension payments for one year from your termination date.

The letter Mr. Falotti signed on September 10, 1996, stated that to the extent that the provision above conflicted with his employment contract, the provision above controlled and that "if Oracle terminates the Employee Agreement without cause, the terms of the [July 2] letter shall prevail" (Henschke Decl., Exh. 4, at 1–2). Mr. Falotti was terminated without cause. From the plain language of his severance contract, which was specifically negotiated by him, he was entitled to the severance stated above. Since he had already received 50% of the stock-option grant discussed in the contract, he was entitled to no other stock options as total severance and no other accelerated vesting. This provision is dispositive for all the stock options at issue. By its breadth, this pro-

vision applied to any and all severance due to Mr. Falotti if he were terminated without cause. Accordingly, this order holds that Mr. Falotti was not entitled to any stock options vesting after May 31, 2000. As a separate and independent ground for this conclusion, this order holds that neither the stock-option agreement, nor his employment contract entitled Mr. Falotti to any stock options vesting after May 31 or to their value, as follows.

## II. The Stock–Option Agreement

■ Stock-option contracts are interpreted under the normal rules of contract interpretation, looking to the specific language of the contract, the facts of the case, and the general contract-interpretation principles of the applicable law. *Scribner v. Worldcom, Inc.,* 249 F.3d 902, 907 (9th Cir.2001). Entitlement to stock options, the parties argue, turns on the interpretation of the italicized language from the terms and conditions of the stock-option plan:

> Except as provided below in this Section, this Option shall terminate and may not be exercised if Optionee ceases to be employed by the Company or any Parent or Subsidiary or Affiliate of the Company. *Optionee shall be considered to be employed by the Company for all purposes under this Section 3 if Optionee is an officer, director or full-time employee* of the Company or any Parent, Subsidiary or Affiliate of the Company or if the Board determines that the Optionee is rendering substantial services as a part-time employee, consultant, contractor or advisor to the Company or any Parent, Subsidiary or Affiliate of the Company. *The Board shall have discretion to determine whether Optionee has ceased to be employed by the Company and the effective date on which such employment terminated.*

In one of his central contentions, Mr. Falotti argues that he should have been "considered to be employed by the Company for all purposes of" the stock-option agreement because Swiss law prohibited his termination until September 30 Specifically, Mr. Falotti's employment contract was governed by the Swiss Code of Obligations, which applied to all employment contracts in Switzerland. Two provisions of the Swiss Code of Obligations bore on when Mr. Falotti was terminated under Swiss law. First, Article 335c of the Code of Obligations provided:

The employment relationship may be terminated at the end of a month during the first year of service with a notice period of one month, in the second and up to and including the ninth year of service with a notice period of two months, and thereafter with a notice period of three months.

These periods may be altered by written agreement, standard employment contract or collective employment contract. They shall, however, be reduced to less than one month only by collective employment contract and only for the first year of service.

Second, Article 336c of the Code of Obligations stated in part:

1. [T]he employer shall not terminate the employment relationship . . .

b. during the period that the employee is prevented from performing his work fully or partially by no fault of his own due to illness or accident for 30 days in the first year of service, for 90 days as of the second year until and with the fifth year of service, and for 180 days as of the sixth year of service.

2. Notice given during one of the forbidden periods in paragraph 1 shall be null and void. If the notice is given prior to the beginning of such period, however, and if the notice has not expired prior to such period, the expiration shall be suspended and shall continue only after termination of the forbidden period.

Mr. Falotti argues that because he could not have been terminated when he was ill from May 30 until July 10, his two-month notice period did not begin running until July 10, when he had recovered. Since an employee cannot be terminated until the end of a month under Swiss law, his employment did not end until September 30, he maintains. Oracle, on the other hand, contends that under California law, which expressly governed the stock-option plan, Mr. Falotti was not a "full-time employee" eligible to vest in stock options after May 31 and that the compensation committee had discretion to determine when Mr. Falotti "ceased to be employed by the company and the effective date on which such employment terminated."

██ As both sides acknowledge, the stock-option agreement was governed by California law. Under California law, Mr. Falotti was not a full-time employee after May 31, since he was told he was terminated, he was relieved of his duties, his password was changed, his office was cleared out, and he performed no active work at all for Oracle. Mr. Falotti, however, maintains that Oracle breached the implied covenant of good faith and fair dealing because the stock-option committee abused its discretion. "The essence of the covenant of good faith is objectively reasonable conduct." *Badie v. Bank of America*, 67 Cal.App.4th, 779, 796, 79 Cal.Rptr.2d 273 (1998) (quotation omitted). It was not an abuse of discretion for the compensation committee to apply California law, since the stock-option agreement required it to do so. Nor was the committee required to consider Swiss law. The choice-of-law provision and integration clauses in the stock-option agreement evidence that the

plan was intended to be self contained, to be administered under rules familiar to the members of the committee and to apply similarly to all Oracle employees. *See Northrop Corp. v. Triad Int'l Mktg., S.A.,* 811 F.2d 1265, 1270 (9th Cir.1987) ("choice-of-law and choice-of-forum provisions in international commercial contracts are an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction, and should be enforced absent strong reasons to set them aside") (quotation omitted). The committee's decision was in keeping with the stated purpose of the stock-option plan, since Mr. Falotti had made no present or potential contributions to Oracle after May 31, and the purpose of the plan was "to provide an incentive to eligible employees ... whose present and potential contributions are important to the continued success of the Company" (Cooper Decl., Exh. 6, at 1–2).

Thus, the committee's conclusion as to when Mr. Falotti ceased to be employed for purposes of the stock-option plan is a second and dispositive basis for denying him any stock options. In opposition to this conclusion, Mr. Falotti makes a number of contentions, each of which is addressed in turn below.

### a. California Authority

Mr. Falotti's first attack on the committee's discretion is that California law prevented the committee from relying on the date he was wrongfully terminated according to Swiss law for the purpose of determining when he ceased to be employed under the stock-option plan. This argument is rejected because the decision upon which he relies in inapposite.

According to Mr. Falotti, *Bertero v. National General Corp.,* 254 Cal.App.2d 126, 62 Cal.Rptr. 714 (1967), held that "an employer cannot rely upon a wrongful date of termination established through breach of an employment contract as the effective date of termination for purposes of depriving an employee of additional vests under a stock option agreement" (Br. 23–24). In *Bertero,* the plaintiff was granted two stock options as part of his employment contract. The options gave him the right to purchase stock at his strike price within seven years, as long as he was an employee. Delaying the stock purchases gave the plaintiff considerable tax benefits. The plaintiff was fired without cause in violation of his employment contract, the precise terms of which were unclear in the court's decision. The court held that the plaintiff could still exercise the options, reasoning that he would still have been an employee but for his wrongful termination.

*Bertero* is not on point for the simple reason that the plaintiff in *Bertero* had already been granted the stock options— the court's decision had nothing to do with vesting. Moreover, unlike Mr. Falotti, the plaintiff in *Bertero* was only terminable for cause. Thus at the time of contract formation, Mr. Bertero had a reasonable expectation that he would be able to postpone exercising the options for seven years. Most significantly, *Bertero* did not address the situation where, as here, there was a web of contracts governed by conflicting laws from different countries, much less require the terms of an employment contract to override an express choice-of-law provision in an internationally-administered stock-option plan. *Bertero* does not control here. This attack is rejected.

### b. Inconsistency with Past Decisions by Stock–Option Committee

The second attack made by Mr. Falotti is that the stock-option committee's decision was an abuse of discretion because it was inconsistent with the committee's past

decisions. The record, however, does not bear out this assertion.

According to Mr. Boskin, one of the compensation committee members, the committee's policy, was, with infrequent exceptions, to find that an optionee ceased to be employed for the purpose of the stock-option plan when he or she ceased actively working for Oracle (Boskin Dep. 125, 127–28). This statement is supported by the record. According to Robert Cortenraad, Director of Human Resources, EMEA, Oracle Switzerland has terminated 26 employees since 1996, and only one of them, Frank Moellhoff, was allowed to vest in options during his notice period (Cortenraad Decl. ¶¶ 7, 9). According to Mr. Boskin, "we gave Frank Moellhoff, as I recall, I think an extra 30 days, maybe, for vesting, something management had negotiated and recommended to us, and we agreed to" (Boskin Dep. 121). The committee, however, denied Mr. Moellhoff's claims that his employment contract entitled him to additional vesting beyond the one month. In his deposition, Mr. Moellhoff stated that it was his understanding that it was Oracle's policy to allow employees to vest during their notice periods (Moellhoff Dep. 106). He could not, however, identify anyone who was permitted to vest in stock options during a notice period after they had been terminated (id. at 184). His testimony does not establish that the committee's decision in the present case was not in keeping with its precedent.

In support of his contention, Mr. Falotti argues that Oracle allowed the following former executives to vest during their notice periods: Look Van Den Boog (Mr. Falotti's predecessor), Alistair Crawford, Keith Taylor, and Jean Claude Sainctavit (Br. 10–11). Mr. Van Den Boog, however, was allowed to vest because he negotiated a "deed of settlement" with Oracle (Henschke Decl., Exh. 27). The settlement included no negative publicity and a release of claims (id. ¶¶ 9, 13–14, 16). This compromise does not amount to a policy or a concession by Oracle that the stock-option plan allowed Mr. Van Den Boog to vest during his notice period. At most, it shows that Oracle was aware that there was a tension between its stock-option plan and European law. Mr. Kearney testified in his deposition that both Mr. Crawford and Mr. Taylor negotiated settlements with Oracle as well (Kearney Dep. 39–42), and Mr. Falotti has not offered any evidence contradicting this. Mr. Sainctavit was allowed to purchase stock options that vested during his notice period, but the record is unclear as to why (Westerdahl Dep. 278–79). That one, or even a few, executives were allowed to vest by way of a compromise of threatened claims, or out of a desire to see an amicable separation does not amount to evidence of a policy or an admission by Oracle, or an abuse of discretion by the compensation committee in this case. This attack is therefore rejected.

#### c. Refusal to Recognize Swiss Law

Mr. Falotti's third attack is that the compensation committee abused its discretion by ignoring Swiss law. As already stated, the stock-option plan did not require the compensation committee to apply Swiss law. If the compensation committee was entirely unaware that Swiss law may have been applicable, perhaps an abuse of discretion could be found. That was not the case, however, since the materials given to the compensation committee included Mr. Falotti's Swiss-law employment contract, and the committee members testified that they discussed the relevance of Swiss law. Mr. Boskin testified that at the compensation-committee meeting (Boskin Dep. 171):

There was some brief discussion of the relevance of Swiss law, and then—there

was a discussion of it at the meeting, but I don't recall the specific content of it. What I do recall is the bifurcation, that California law governed with respect to administration of the plan, and therefore what Swiss law may have provided for, other aspects of things, was irrelevant to our determination.

Mr. Lucas also testified that he aware that Mr. Falotti's employment contract was governed by Swiss law (Lucas Dep. 72). Nor was the committee instructed to ignore Swiss law, as Mr. Falotti alleges. Mr. Boskin testified that Mr. Cooperman, in-house counsel, "said something like it's our view that the plan is clear that California law governs" (Boskin Dep. 161), and that outside counsel advised him that "the determination should be made under California law" (*id.* at 203). Neither of these statements were instructions to ignore Swiss law. There is no evidence that counsel misled the committee. The evidence suggests that the committee considered, and rejected, the theory that Swiss law entitled Mr. Falotti to any stock options, based in part on advice from counsel. That was not an abuse of discretion. Accordingly, this attack is also rejected.

### d. Oracle's Recognition of Right to Vest

Mr. Falotti's fourth, and last, attack is that the committee abused its discretion because Oracle recognized that employee's were entitled to vest in stock options during their notice periods. The evidence offered, however, does not alter this order's conclusion.

In addition to the previously discussed treatment of former executives, a letter sent to EMEA executives in June of 2000, Mr. Falotti contends, demonstrates that Oracle was aware that employees were entitled to vest in stock options during their notice periods. In exchange for shares of stock, the letter asked the employee to relinquish the right to "unvested

stock options granted under the 1991 Long–Term Equity Incentive Plan which would have vested during the notice period" (Henschke Decl., Exh. 52). Accompanying the letter was a note from Mr. Kearney, stating: "The change is effective from September 1st so your existing rights will remain unchanged until that date and the company will not dispute any entitlement to options vesting during notice before September 1, 2000" (Henschke Decl., Exh. 26). Additionally, he points to an email from Gary Bloom to Safra Catz, Senior Vice President, Oracle, which read: "There was mention from the legal review that our stock option agreements need to be tighter around the exclusion clause. While the agreement prevents employees from insisting on continued employment for stock to vest, it does not exclude the possibility of compensation for loss of stock options should the employment contract be unlawfully terminated" (Henschke Decl., Exh. 50, at 2). And he notes that Oracle has now revised its stock-option plan to provide no entitlement to stock-options once Oracle has notified the employee of termination "regardless of whether the notice or termination is lawful or unlawful" (Henschke Decl., Exhs. 53–54). None of these communications are evidence that Oracle understood that employees were entitled to vest during their notice periods. They simply show that in the wake of this litigation and similar disputes, Oracle sought to prevent these problems from occurring.

Last, Mr. Falotti argues that an email from Mr. Ellison demonstrates that Oracle was aware of his entitlement to stock options vesting during his notice period. It read (Henschke Decl., Exh. 21):

Lets give Pier Carlo his notice no later than April 30th. We will offer him a part consulting job after he completes his two month notice period ending June 30th. There will be no more stock vest-

ing after June 30th at the latest. Prepare the papers immediately. We can accelerate Peir [sic] Carlo's termination date to before April 30th if that is in Oracle's interest.

Larry

This email suggests that Mr. Ellison believed that Mr. Falotti would be able to vest during his notice period. Indeed, in his deposition, Mr. Ellison stated: "there was certainly a time when I was told that he was entitled to two months of vesting, and there was a time when I was told he was not entitled to two months of vesting. Different lawyers told me different things" (Ellison Dep. 201). This statement does not mean that the stock-option committee abused its discretion.

It is true that Oracle's Chairman and CEO, Mr. Ellison, testified that his lawyers gave him contradictory legal advice as to Mr. Falotti's option rights. But this ambiguity does not warrant a jury trial. The material facts are not in dispute. There is no need for fact finding by a jury. What is in dispute is the legal conclusion to draw from the record. That the legal conclusion may be debatable does not justify holding a trial on this issue. The Court has the responsibility to decide the law. Holding a trial could not change that outcome.

In sum, the stock-option agreement gave the compensation committee the discretion to determine when Mr. Falotti ceased to be a full-time employee. For the reasons stated above, the committee's decision was fully consistent with the law and the stock-option plan. The record does not support the conclusion that the committee abused its discretion.

As a way around the stock-option agreement, Mr. Falotti argues that even if he was not entitled to any unvested stock options under the stock-option plan, he should receive the value of the unvested stock options as damages for breach of his employment contract. The thrust of this argument is that the value of the unvested stock options was either consequential damages or wages. As will be discussed below, even if the express severance provision did not foreclose this theory of recovery, it would nonetheless be rejected.

## III. Employment Contract

■ As already stated, because of his illness until July 10 and his notice period, Mr. Falotti argues that under Swiss law, he could not be terminated until September 30. For his contention that breach of his employment contract entitled him to stock options, he relies on Article 337c of the Swiss Code of Obligations, which provides in part:

> If the employer dismisses the employee without notice in the absence of a valid reason, the latter shall have a claim for compensation of what he would have earned if the employment relationship had been terminated by observing the notice period or entitle the expiration of the fixed agreement period.

The problem with this theory is that is that the notice period does not entitle an employee to reinstatement. The effect of the notice period is to provide an employee severance benefits in terms of salary to ensure that the employee is not deprived of an income source during job-transition periods. *Beatrice B. v. Solothurn Cantonal Pub. Unemployment Fund,* at 3 (Aug. 17, 1989).[3] Oracle had the right to relieve him of his duties and to preclude him from working during his two-month notice period. According to Mr. Falotti's own expert (Henschke Decl., Exh. 12, Aubert Expert Report, at 8):

---

3. Cooper Decl., Exh. 21 at 3.

It happens often in Swiss business practices that the employer that terminates the employment contract, continues to pay the salary but releases the employee from his obligations of working during the notice period. In this case, the employee continues on the payroll of the company until the end of the notice period and continues to be covered under social insurance. The employee may accept another job that is not in competition with his employer.

According to Mr. Falotti, he was totally incapacitated from working while he was ill from May 30 until July 9. Regardless of when his termination became effective under Swiss law, after May 31, he was either incapable of performing any active work or legally precluded from doing so. As he would not have been a full-time employee providing present or future contributions to Oracle after May 31, under its stated policy and California law, the compensation committee should not have allowed him to vest after this time. The value of the stock options vesting after May 31 was thus not "what he would have earned if the employment relationship had been terminated by observing the notice period."

Mr. Falotti also contends that he was entitled to the value of the stock options because the stock options were considered wages under Swiss law. Swiss Code of Obligations Article 322 reads: "The employer shall pay the employee the wages that are agreed, or are customary, or are fixed by standard employment contract." Mr. Falotti's employment contract, however, made no mention of stock options as wages. The contract he negotiated provided that stock options would be granted under a separate agreement. It also stated that he would receive some stock options as a severance benefit, but as already noted, he has already received all the severance due under his employment agreement.

According to Mr. Falotti's expert, the Swiss definition of wages is expansive (Aubert Rebuttal Report at 6). The Code of Obligations states that the following are wages: "a contractual right to a share of profits, or sales, or in some other manner a right to the proceeds of the business" (Art. 322a); a commission (Art. 322b); and a bonus (Art. 322d). Stock options are conspicuously absent from this list. According to Mr. Falotti's expert, no Swiss court has ever held that stock options are covered by Article 322a (Aubert Dep. 118). The only Swiss decision dealing with stock options, Mr. Falotti's expert states, is *Paterno v. Guyerzeller Bank* (*ibid.*).

The *Guyerzeller Bank* case, however, is too thin a reed to support the proposition that stock options are always considered to be wages as a matter of Swiss law. In *Guyerzeller Bank,* a bank set up a shell corporation, MHC, to provide executives with a "bonus" that corresponded to a percentage of the bank's profits (Cooper Reply Decl., Exh. 6 ¶¶ B, C). Employees were issued shares of MHC every year, which they could sell back to the bank after six years. According to the contract between the bank and its employees, if an employee was terminated, the employee could sell back shares for the value of the stock, if the employee was a "good leaver" (*id.* ¶ D). Otherwise, the employee was required to relinquish the stock at one dollar per share. The plaintiff, Damiano Paterno, was issued shares in 1995, 1996, and 1997 (*id.* ¶ G). In 1997, the bank sought to restructure the terms of the stock-option contract so that employees would no longer receive certain tax benefits. Mr. Paterno did not agree to the new contract, and was terminated in October of 1997. In 1998, he sued the bank for the value of the stock he owned. The Swiss court held (*id.* ¶ 4(b)):

> The Defendant's argument to the effect that the amounts in dispute represent a

non-payable and arbitrary incentive has to be rejected. Indeed, the litigation or the case in point does not bear on unpaid cash incentives being challenged by the employer as being due, but rather on those incentives which the employer has in fact granted (as confirmed by various messages—see Defendant's items 11 and 13) and which form an integral part of the employee's salary. This decision did not hold that all stock options are a form of salary as a matter of law. Rather, it held that on the facts of the case, the "bonus" given to Mr. Paterno—stock options that had already vested—was an integral part of his salary. Moreover, the decision distinguished between unpaid incentives and ones which had already been granted.

■ This Court will not endorse a novel Swiss-law theory creating a rigid definition of stock options from this lone precedent. Based on the distinction between unpaid incentives and salary drawn by the Swiss court, Swiss law seems to recognize a flexible approach similar to the one recognized in California:

> Treatises which describe employee stock options in the context of general corporations law strongly suggest that contractual rights to such benefits vary so widely as to preclude the accuracy of any but the most general characterizations of them. Thus, there is no compelling reason to require that employee stock options must always be classified as compensation exclusively for past, present, or future services. Rather, since the purposes underlying stock options differ, reference to the facts of each particular case must be made to reveal the features and implications of a particular employee stock option.

*In re Marriage of Hug,* 154 Cal.App.3d 780, 784, 201 Cal.Rptr. 676 (1984).

Based on the facts of this case, this order holds that stock options under Ora-

cle's stock-option plan were not salary. Oracle's stock-option plan stated that its purpose was the following (Cooper Decl., Exh. 5, at OR 40886–87):

> to provide an incentive to eligible employees, officers, independent consultants, directors who are also employees or consultants, and advisers whose present and potential contributions are important to the continued success of the Company ... and to enable the Company to continue to enlist and retain in its employ the best available talent.

The stated purpose of Oracle's plan was incentive. "Consistent with the emphasis on incentive is the supposition that options are granted for future services, either primarily or exclusively." *Hug,* 154 Cal. App.3d at 786, 201 Cal.Rptr. 676. Both of Oracle's compensation committee members affirmed this. Mr. Boskin, for instance, stated (Boskin Dep. 93):

> Q: What do you view the purpose of the stock-option grants to employees as being?
>
> A: Purpose of the stock-option grant is a device to attract, retain, and incentivize people to excel in their performance.
>
> Q: To what extent do you consider stock-option grants to be a reward for past performance?
>
> A: I don't.

He testified that allowing Mr. Falotti to vest would have been inconsistent with the purpose of the stock-option plan (*id.* at 205):

> Q: Inconsistent how?
>
> A: Mr. Falotti had been terminated, so I don't see how we could have been incentivizing him to do anything—to do any work for Oracle, given he ceased to work. I don't see how the relevance of the plan to attract talent was relevant to that, because he had—he was no longer with the firm. We didn't want to retain

him. We weren't trying to attract him. Those are the three purposes of the plan.

Similarly, Mr. Lucas testified (Lucas Dep. 52):

Q: At Oracle were stock options granted to award past performance?

A: No.

Q: Why were they awarded?

A: Why were they awarded?

Q: Yes.

A: They were awarded as an incentive regarding future performance as long as the person was employed by the corporation.

Under Oracle's stock-option plan, the stock options were not salary: they were incentives for future performance.

Last, Mr. Falotti argues that Article 97 of the Swiss Code of Obligations entitled him to the value of stock options that would have vested in June, July, and September. This provision reads:

If the performance of an obligation can not at all or not duly be effected, the obligor shall compensate (Art. 43, 99 para. 2) for the damages arising therefrom, unless he proves that no fault at all is attributable to him.

According to Mr. Falotti, this general provision entitles a person to recover all foreseeable damages resulting from a breach of contract (Aubert Expert Report at 10; Aubert Rebuttal Report at 5). Assuming *arguendo* that Article 97 is applicable in the employment context, which is disputed, this argument fails for the same reasons already given: his employment contract did not entitle him to stock options.[4]

\*　　\*　　\*　　\*　　\*　　\*

Mr. Falotti compares this case to a number of American decisions involving stock options. These decisions subdivide into three categories, which are addressed in turn. For the reasons stated below, his analogies to these decisions miss the mark.

### a. Stock Options as Wages

Mr. Falotti compares this case to decisions in which other courts allowed wrongfully-terminated employees to recover stock options as damages for breach of their employment contracts. The decisions he cites, however, all involved situations where the stock options were considered to be a form of wages. The analogy to these decisions fails, since the stock options at issue were not wages.

In *Williamson v. Moltech Corp.*, 261 A.D.2d 538, 690 N.Y.S.2d 628 (1999), for instance, the plaintiff had a three-year employment contract, and his stock-option contract provided that he could exercise his stock options as long as he was employed. The court held that "if the plaintiff's employment had been wrongfully terminated, his stock option rights would not be terminated." *Id.* at 539, 690 N.Y.S.2d 628. This holding was echoed in *Scully v. U.S. WATS*, 238 F.3d 497, 506–07 (3d Cir. 2001), in which the plaintiff had a two-year employment contract, and in *Haft v. Dart Group Corp.*, 877 F.Supp. 896, 903 (D.Del. 1995), which held: "Wrongful termination of an employee under a fixed term contract precludes an employer from denying an employee stock option rights." In all these decisions, the stock-option agreements were coupled with employment contracts with fixed durations, during which

---

4. Since there are provisions of the Employment Contracts section of the Code of Obligations (Title X) directly applicable to Mr. Falotti's employment, this more general provision appears to be inapplicable as a matter of Swiss statutory construction. In *P v. SATA*, for instance, the court held that be-

cause Article 324 was applicable to the issue of damages for breach of the employment contract: "the general provisions governing the consequences of the failure to fulfill contractual obligations (art. 97 . . .) are not, as a rule, applicable" (Cooper Reply Decl., Exh. 9, at 4).

the employee could not be fired, except for cause. In such a situation, there was a clear expectation from the outset that the employee would continue to vest in stock options during the entire fixed term. Under those circumstances, the stock options were clearly contemplated as compensation. That is not the case here, where Mr. Falotti's employment contract allowed termination without cause and expressly provided for partial (but only partial) stock-option vesting by way of severance.

Similarly, in *Langer v. Iowa Beef Packers, Inc.*, 420 F.2d 365 (8th Cir.1970), the plaintiff's contract provided that he would be able to exercise a stock option after he had worked for the defendant for two years, but that this right would terminate if the plaintiff ceased to be an employee of the defendant. Shortly after the plaintiff had completed two years of service, the defendant assigned the plaintiff's contract to another company without prior notice to the plaintiff. Applying Iowa law, the Eighth Circuit allowed the plaintiff to exercise the option, finding that plaintiff's working for the defendant for two years was "full consideration" for his right to exercise his stock options. *Id.* at 369. *Langer* is not on point for several reasons, the first being that the plaintiff's right to exercise the stock option in that case had already vested. It also fails as an analogy, because the court in *Langer* had determined that the plaintiff had given "full consideration" for the right to exercise the option. As already stated, that is not necessarily the case when there is an incrementally-vesting stock-option plan and the employee may be terminated without cause. For the reasons previously given regarding the specifics of Oracle's stock-option plan, the present case is not comparable to these decisions.

### b. Discrimination Cases

The analogy made by Mr. Falotti to two decisions under anti-discrimination statutes is also unpersuasive. In *Greene v. Safeway Stores, Inc.*, 210 F.3d 1237 (10th Cir.2000), for instance, an employee who was terminated in violation of the ADEA was allowed to recover damages for "unrealized stock option appreciation," because he was forced to exercise his options—which had vested—before he would have had he not been terminated. *Id.* at 1243. In upholding this award, the Tenth Circuit emphasized that the ADEA allows a court to grant equitable relief necessary to uphold the purposes of the Act: deterrence, and providing compensation for injuries caused by illegal discrimination. *Id.* at 1243–44.

In contrast to *Greene*, the present case is simply for breach of contract. None of the policy considerations implicated in *Greene* come to bear. Rather, the policy behind the forbidden period and the notice period is to ensure that an employee has some income to sustain him or her during job-transition periods. *Beatrice B.*, at 3 (Aug. 17, 1989).[5] The same holds true for *Scarfo v. Cabletron Systems, Inc.*, 54 F.3d 931 (1st Cir.1995), in which the First Circuit upheld a trial court's determination that a plaintiff in a Title VII case was entitled to damages for the value of stock options she was not issued in contrast to her male counterparts. To the extent that either of these decisions suggested that an employee is entitled to unvested options, both are inapplicable here.

### c. General Principles of Contract Law

Mr. Falotti also cites decisions for the even more general principle that a party should not be able to profit from its own wrongdoing. *E.g.*, *Kaneko v. Okuda*, 195

---

5.  Cooper Decl., Exh. 21 at 3.

Cal.App.2d 217, 15 Cal.Rptr. 792 (1961). According to Mr. Falotti, Oracle should not be allowed to profit by violating Swiss law, *i.e.*, by trying to terminate him while he was incapacitated. This argument fails, because it is premised on the assumption that the stock-option committee would have allowed him to continue vesting when he had no job duties, Oracle did not want to retain him, and he was performing no active work. As stated, under Swiss law, an employer does not have to allow an employee to keep working during the notice period, and Mr. Falotti claims that he was unable to work while he was ill. Because he would not have contributed anything to Oracle after May 31, regardless of whether he was sick or entitled to a notice period, he would not have received any stock options after May 31.

### IV. Date of Termination Under Swiss Law

While Mr. Falotti's employment contract did not entitle him to the value of unvested stock options as damages, Oracle still owes him the salary due under the severance agreement, since Oracle has not paid Mr. Falotti any salary since May 31, 2000. Under the severance provision, Mr. Falotti was entitled to one-year's salary from the date his termination became effective under Swiss law. For the reasons already discussed, in his cross-motion for partial summary judgment, Mr. Falotti contends that this date can be no earlier than September 30.

#### a. Illness

■ From the decisions cited by the parties' experts, it is apparent that questions of material fact exist as to whether Mr. Falotti was incapacitated from working on May 30, 2000, or thereafter. Given

his tenure, under Swiss law, Mr. Falotti had a "forbidden period" of 90 days. During that time, he could not be terminated if he was fully or partially incapacitated from working. Mr. Falotti argues that the medical certificate from Dr. Hadorn establishes that as a matter of law, he had "total working incapacity" and could not be terminated. According to him, a medical certificate establishes a prima facie case that an employee is disabled, and if an employer wishes to contest a medical certificate, it must seek an independent medical examination "immediately." He relies on two decisions: *Mrs. R. v. Ass'n X* (Mar. 12, 1999) and *Mrs. E. v. P. Inc.* (Dec. 12, 1995).

In *Mrs. R.*, the plaintiff was entitled to a 30–day forbidden period. On September 2, the plaintiff obtained a medical certificate from her doctor stating that she was disabled. She continued to work until September 12, when she was hospitalized. On October 4, the defendant informed the plaintiff that she would be terminated on November 30. The plaintiff argued that her termination was ineffective because her 30–day period did not begin to run until September 12, when she actually stopped working. The defendant, on the other hand, argued that the period began on September 2, the date that the plaintiff obtained her medical certificate, making its termination on October 4 more than one month after she became sick. The court stated: "The employee is responsible for providing proof of occupational disability. In the event of illness or accident, the employee will most often have recourse to a medical certificate.... However, the medical certificate does not constitute an absolute form of proof" (Cooper Decl., Exh. 18, Expert Report of Francois Bellanger, Exh. C at 6).[6] The court held that

---

6. Mr. Falotti has provided a different translation (Henschke Decl., Exh. 13). There is no significant difference in the two translations.

the termination was valid, because from the medical certificate and from her hospitalization only ten days later, it could infer that the plaintiff was suffering from a partial work disability on September 2, triggering the beginning of the forbidden period.

In *Mrs. E.*, the plaintiff, who was pregnant, submitted a medical certificate stating that in addition to her pregnancy, she was disabled from working. Based on statements that she made, however, the cantonal court found that she was not sick and therefore not entitled to a forbidden period. A federal court reversed. It stated that while a medical certificate is not absolute proof of a disability, "the doubt cast on its veracity nevertheless supposes some serious reasons" (Henschke Decl., Exh. 13, page 267 of casebook of Gabriel Aubert).[7] The court further stated that an "employer has a right to have, at its own costs, the existence and the degree of the incapacity examined through a physician chosen by him. It is required that the employer ask for this second opinion immediately" (*ibid.*). It further noted that: "Concerning a question of valuation of evidence, the judge of the case has wide powers in this matter" (*ibid.*).

Mr. Falotti is correct that both these decisions hold that a medical certificate is entitled to a presumption of correctness. This presumption, however, can be rebutted, and the final determination rests with the finder of fact—a judge in Switzerland, and a jury here. While in *Mrs. E.* the court stated that it "is required" that an employer seek a second examination "immediately," the decision did not hold that an employer's failure to exercise its "right" to do so constitutes a waiver of its right to challenge the certificate's accuracy. Indeed, in *Mrs. E.*, the court stated that other factors may prove dispositive, for instance: "The behavior of a salaried worker may be taken into account in particular, so as to invalidate a medical affidavit" (*ibid.*). Mr. Falotti's expert, likewise opined in one of his publications, *Right to Wages*, that: "this certificate does not carry absolute weight of evidence. Recent case law shows that the courts, now more often than before, do not hesitate to reject a medical certificate when circumstances cause it to appear to be a product of the employee's deceit with regard to his doctor or complicity by the doctor with regard to the employee" (Cooper Opp. Decl., Exh. 17).

Taking into account the presumption of correctness owed to Dr. Hadorn's certificate, whether Mr. Falotti was ever in fact incapacitated must be determined by a jury. Some of the circumstances surrounding his reported illness support an inference that he was not sick. For instance, he had not seen Dr. Hadorn for around three years, yet hurriedly met with him the day before he was told he was terminated. He continued to work, after he was declared to have total working incapacity. He did not mention his illness or submit his medical certificate to Oracle until after he was told he was terminated. He recovered suddenly, after Oracle had requested an independent medical examination. Oracle's experts have opined that Dr. Hadorn's examination was insufficient and his diagnosis inaccurate (Cooper Opp. Decl., Exh. 19, Expert Report of Dr. Robert Larsen). And, Mr. Falotti stood the possibility of considerable gain if he were sick. Viewing the inferences from this evidence in favor of the non-moving party, Oracle, it cannot be said that Mr. Falotti is entitled to summary judgment that he was suffering from a working incapacity.

### b. Notice

Since Mr. Falotti worked for Oracle more than two years, but less than nine, he

---

7. Oracle's translation is similar (Cooper Opp. Decl., Exh. 21, at 7).

was entitled to a two-month notice period under Article 335c of the Swiss Code of Obligations. Article 335c also provides that notice period may be partially waived: "These periods may be altered by written agreement, standard employment contract or collective employment contract. They shall, however, be reduced to less than one month only by collective employment contract and only for the first year of service." The letter signed by Mr. Falotti on September 10, 1996, stated: "You further agree that any notice payable for termination without cause payable under your Swiss Employment Agreement shall be waived providing the payment due under the letter shall have been paid." This order does not reach the issue of waiver, since Mr. Falotti's notice period (of at least one month) would have been tolled for any period he was incapacitated from working. Whether Mr. Falotti was sick is a question of fact. The date of his effective termination must be determined at trial.

## V. Oral Contract

■ Mr. Falotti maintains that in January of 2000, Mr. Ellison promised him continued employment through May of 2001, and that this amounted to an oral contract separate from his Swiss-law employment contract. This claim is governed by California law, because Mr. Falotti claims that the alleged contract was made in California, and it was entirely separate and distinct from his employment contract. Any such contract, however, fails to satisfy the statute of frauds. "An agreement that by its terms is not to be performed within a year from the making thereof" is invalid, unless it is "in writing and subscribed by the party to be charged or by the party's agent." Cal. Civ.Code 1624(a). By its terms, the alleged contract could not be completed until a year and several months after formation.

■ Mr. Falotti contends that the email he sent to Mr. Lane on May 30, 2000, was a writing that satisfied the statute of frauds. The email stated: "Here is the announcement I will send out on June 1" (Moore Decl., Exh. H, at 1). The announcement stated that Mr. Falotti had decided to transfer all of his operational responsibilities to Mr. Giacoletto, so that Mr. Falotti could devote all his time to activities such as "helping the Account Management to reach higher levels of decision-makers in our customer base" and "strengthening management contacts with our partners" (*id.* at 1–2). In response, on May 31, the day Mr. Falotti was told he was terminated, Mr. Lane wrote: "Looks fine" (Moore Decl., Exh. I, at 1). According to Mr. Falotti, Mr. Lane, who was President of Oracle at the time, ratified the agreement between Mr. Falotti and Mr. Ellison. Even assuming that Mr. Lane had the power to ratify the alleged agreement, and presuming this email did so (as opposed to approving of the announcement), this email fails to satisfy the statute of frauds. "[W]hen the aspect of the oral contract that brings it within the statute of frauds relates to its duration ('not to be performed within one year from its making'), both common sense and controlling authority indicate that to constitute a sufficient memorandum the writing must at least contain language indicating the duration promised was as claimed." *Munoz v. Kaiser Steel Corp.*, 156 Cal. App.3d 965, 975, 203 Cal.Rptr. 345 (1984). This email was silent as to how long Mr. Falotti would perform the services mentioned. Mr. Falotti argues that an earlier email he sent to Mr. Lane in April satisfies the date requirement. In the earlier email, Mr. Falotti wrote that the conclusion of a discussion he had with Mr. Ellison was: "As of June, I stay for 1 year full time focusing on helping Sergio to master the job ..." (Moore Decl., Exh. G). The

earlier email, however, was merely Mr. Falotti's description of the alleged discussion. It was not adopted by anyone at Oracle. Accordingly, Oracle's motion for summary judgment on the oral-contract claim is granted.

### VI. Promissory Estoppel

■ The elements of a promissory-estoppel claim are: (i) a clear promise; (ii) that the promissor should reasonably expect to induce action or forbearance; (iii) upon which the promisee reasonably relies. *Lange v. TIG Ins. Co.*, 68 Cal. App.4th 1179, 1185, 81 Cal.Rptr.2d 39 (1999). Whether Mr. Ellison actually promised Mr. Falotti continued employment is a question of fact. Oracle has not argued otherwise. Instead, it contends that it was unreasonable as a matter of law for Mr. Falotti to rely on anything Mr. Ellison told him, and unforeseeable to Oracle that Mr. Falotti would rely on any such statement (Br. 22–23). Whether reliance on Mr. Ellison's alleged promise was reasonable is also a question of fact. Since Mr. Ellison was the foremost decisionmaker at Oracle, any promise from him obviously carried great weight. Additionally, there is evidence in the record that others perceived such reliance was reasonable. For instance, Alan Laing, Oracle's former Vice President of Operations and General Counsel of EMEA, stated that he decided to step down as general counsel and to assume a role in the business side of Oracle based in part on Mr. Falotti's statement that Mr. Falotti and Mr. Ellison had agreed to Mr. Falotti continuing at Oracle in a "quasi chairman" role (Laing Dep. 105, 108–110).

Similarly, there is no merit in the argument that Mr. Ellison could not expect Mr. Falotti to rely on an alleged promise of employment. From Mr. Ellison's testimony it is clear that Mr. Ellison understood that if Mr. Falotti believed that he would not be terminated, he would continue to work for Oracle (Ellison Dep. 173–74). While there is no requirement that an at-will employee must be warned of his upcoming termination, this does not mean that an employer can promise employment in order to retain an employee, and then break the promise when it is convenient for the employer to terminate him. Whether Mr. Ellison actually made a promise or whether Mr. Falotti merely hoped to keep working for Oracle cannot be determined at the summary judgment stage.

■ How any reliance was detrimental, however, is problematic. Mr. Falotti testified that he did not receive any job offers between January of 2000, when the promise was allegedly made, or since (Falotti Dep. 16–17). He testified that after August of 2000, Siebel and another company asked him if he was interested in working for them, but that he stated he was not, because he did not want to work full-time (*ibid.*). Because no evidence shows that he looked for, or would have received or accepted other jobs between January and May 31, or thereafter, Oracle argues that Mr. Falotti cannot show any legal detriment. Mr. Falotti's sole argument in opposition is that "in reliance on that promise, he was not looking for another job" (Opp. 24). This theory, however, eliminates the detrimental-reliance requirement in a promissory-estoppel claim. While he has not advanced this point in his opposition to Oracle's motion for summary judgment, in opposition to an earlier motion to dismiss, Mr. Falotti argued that his legal detriment was that he continued to work for Oracle when he did not want to, despite the adverse effects job stress was having on his health. There is no evidence in the record supporting that his health deteriorated between January and May. His claim that he suddenly became incapacitated to work due to depression on May 30 is insuf-

ficient to show that he was previously working in the face of illness. At summary judgment he has the burden of putting forth some evidence of detrimental reliance. He has not.

Moreover, without detrimental reliance, Mr. Falotti cannot prove damages. He does not allege, much less provide any evidence, that he was promised any stock options or that he would be allowed to vest in prior grants under the new alleged agreement.[8] In his deposition, he stated that his compensation for the position he was allegedly promised was unknown (Falotti Dep. 211–12):

Q: All right. Was your compensation for 2001 going to change?

A: Well, I never assumed it was going to stay the same, but I suppose we would have decided when June 1st arrived.

There is no way to gauge with any certainty what salary he and Oracle might have agreed upon after June 1. While this uncertainty would not preclude him from recovering reliance damages, as already stated, nothing in the record shows that he suffered any reliance damages, since nothing shows that he would have received or accepted a job offer. Accordingly, summary judgment in favor of Oracle on this counterclaim must be granted.

## CONCLUSION

1. Oracle does not owe Mr. Falotti any stock options under Oracle's stock-option plan, beyond options vesting on or before May 31, 2000.

2. Oracle does not owe Mr. Falotti any stock options or the value thereof under Mr. Falotti's employment contract.

3. When Mr. Falotti's termination became effective under Swiss law shall be determined by a jury, for purposes of his lost salary claim.

4. Oracle's motion for summary judgment on Mr. Falotti's counterclaim for breach of oral contract is **GRANTED.**

5. Oracle's motion for summary judgment on Mr. Falotti's counterclaim for promissory estoppel is **GRANTED.**

6. Mr. Falotti's cross-motion for summary judgment is **DENIED.**

The only question remaining in this action is when Mr. Falotti's termination became effective, and how much salary he is due as a result. A jury trial shall commence on **October 15, 2001.**

**IT IS SO ORDERED.**

---

8. Mr. Falotti's promissory-estoppel claim is based solely on the theory that the alleged promise by Mr. Ellison was entirely independent of Oracle's prior contractual relationship with him. If it were an oral modification of his existing contracts, it would be foreclosed by California law. *Malmstrom v. Kaiser Aluminum & Chem. Corp.,* 187 Cal.App.3d 299, 318, 231 Cal.Rptr. 820 (1986).